### STATE vs. WILLIAM GRIER.

1. CONSTITUTIONAL LAW—JUDICIAL POWERS—ENCROACHMENT UPON LEGISLATURE—WISDOM OF ACT.

In passing upon the constitutionality of a statute the court can consider only the power of the Legislature to enact it, not the wisdom or necessity of its enactment.

2. STATUTES—TITLE OF ACT—EXPRESSION OF SUBJECT.

If the subject of an act is so broad that the title does not fairly express it comprehensively enough to include all the provisions contained in the act,

the title is not sufficient under *Const. art.* 2, § 16, requiring the subject of an act to be embraced in its title.

3. CONSTITUTIONAL LAW—DETERMINATION OF CONSTITUTIONAL QUESTIONS.

An act of the Legislature, when attacked on constitutional grounds, should be declared valid, if it is possible under the law to do so.

4. STATUTES—TITLE OF ACT—EXPRESSION OF SUBJECT.

*Const. art.* 2, § 16, requiring the subject of an act to be expressed in the title, does not require the title to do more than state in general terms the subject. It need not go into details, nor furnish an abstract, synopsis, or index of the act.

5. STATUTES—TITLE OF ACT—SHIPMENT OF LIQUORS.

27 *Del. Laws, c.* 139, is entitled "An act regulating the shipment or carrying of spirituous, vinous or malt liquor into local option territory, or the delivery of the same in such territory." *Section* 1 prohibits common carriers from accepting such liquor for shipment or delivery into local option territory; *section* 2 prohibits any person engaged in the manufacture or sale of such liquor, or its agent, from carrying or delivering it into local option territory; *section* 5 excepts shipments to physicians and druggists in limited quantities from the provisions of the act; and *section* 6 prohibits any person from bringing from any other point in the state into local option territory more than one gallon of such whisky in any twenty-four hours. *Held*, that while *sections* 1 and 2, standing alone, establish prohibition, and not a regulation, and therefore would not be expressed by the title, the act, construed as a whole, is a regulation of shipments, permitting certain shipments, and prohibiting others, and the subject of the act is therefore properly expressed in its title.

6. STATUTES—TITLES OF ACT—EXPRESSION OF SUBJECT.

In determining whether the subject of an act is expressed in its title, the whole act, together with its manifest purpose and scope, must be considered.

7. EVIDENCE—JUDICIAL NOTICE—LAWS OF THE STATE—MATTERS OF COMMON KNOWLEDGE.

In determining whether the subject of 27 *Del. Laws, c.* 139, regulating shipments of liquor, is embraced in its title, the court will take judicial notice of the laws and conditions respecting intoxicating liquors in the state at the time of the passage of the act.

8. INTOXICATING LIQUORS—CONSTITUTIONALITY OF ACTS—PROHIBITING SHIPMENTS.

The Legislature had authority under the police power of the state to prohibit the shipment of liquors into local option territory by common carriers and liquor dealers, as a means of preventing the sale in such territory, provided the classification was legal.

9. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS—CLASSIFICATION.

In determining whether a classification is in violation of *Const. U. S. Amend.* 14, providing that no state shall deny to any person the equal protection of the laws, the test is whether the classification rests upon some difference which bears a reasonable and just relation to the act in respect to which the classification was proposed.

**10. CONSTITUTIONAL LAW—EQUAL PROTECTION OF THE LAWS—SHIPMENT OF INTOXICATING LIQUORS—EXCEPTIONS.**

It was the manifest, though unexpressed, intent of the Legislature, in enacting 27 *Del. Laws*, *c.* 139, § 5, permitting shipments of liquors to physicians and druggists, that the use of such liquors by physicians should be restricted to medicinal purposes, even though there was no statute to that effect, as there was in the case of druggists, and therefore that section does not violate *Const. U. S. Amend.* 14, guaranteeing the equal protection of the laws.

**11. CONSTITUTIONAL LAW—EQUAL PROTECTION OF THE LAWS—SALE OF LIQUORS—PHYSICIANS.**

Under the laws existing prior to the passage of that act, physicians might, under the constitutional provision that liquors might be sold for medicinal purposes in local option territory, administer such liquors as medicine, either by writing a prescription, in which case they were governed by the prescription statute of 1911, or without such prescription, and such use by the physicians was contemplated by the Legislature when the act was adopted.

**12. INTOXICATING LIQUORS—REGULATIONS—SALES IN LOCAL OPTION TERRITORY—MEDICINAL PURPOSES.**

The provision of the Constitution allowing sales of liquors for medicinal purposes in local option territory does not mean that all persons have the right to sell, but only that physicians and druggists, who alone are licensed to sell medicines, should have the right to sell liquors for that purpose.

**13. CONSTITUTIONAL LAW—PRIVILEGES OF UNITED STATES CITIZENS—SHIPMENT OF INTOXICATING LIQUORS.**

The provision of 27 *Del. Laws*, *c.* 139, § 6, that no person shall bring or have brought in quantities greater than one gallon in twenty-four hours intoxicating liquors into local option territory or another point within the state, bears a real, reasonable, and substantial relation to the sale of intoxicating liquor in prohibited territory, and therefore is a proper exercise of the police power of the state, and not an abridgment of the privileges of the citizen, contrary to *Const. U. S. Amend.* 14.

**14. CONSTITUTIONAL LAW—POLICE POWER.**

In the exercise of its police powers, the state has the right to determine whether the evil exists, and what legislation is necessary to suppress it, and such decision will not be disturbed by the court, unless the legislation proposed is manifestly unreasonable and unwarranted.

**15. INTOXICATING LIQUORS—SHIPMENT OF LIQUOR—CONSTITUTIONALITY OF STATUTE.**

27 *Del. Laws*, *c.* 139, § 2, prohibiting a liquor dealer or his agent from bringing into local option territory any of the prohibited liquor, applies only to such act in the conduct or furtherance of his business, and not in a private capacity, and as such it bears a substantial relation to the sale of liquor in such territory and is a legitimate exercise of the police power.

**16. COMMERCE—SUBJECTS OF REGULATION—TRANSPORTATION OF GOODS—INTOXICATING LIQUORS.**

The transportation or carrying of whisky sold by a citizen of Pennsylvania to a citizen of Delaware from the former to the latter state would not be subject to the Delaware statutes, except for the federal act known as the Webb-

Kenyon law (*Act March* 1, 1913, *c.* 90, 37 *Stat.* 699), prohibiting interstate shipments of liquor to be used in violation of the laws of the destination state, no matter whether the transportation was by a common carrier or by the personal agent of the seller.

17. INTOXICATING LIQUORS—SHIPMENT OF LIQUOR—"LIQUOR DEALERS."

Where a liquor dealer, whose place of business was in another state, came into the state in person or by an agent for the purpose of delivering liquor to a purchaser, he and his agent were "liquor dealers" while making such delivery.

18. COMMERCE—SUBJECTS OF REGULATION—INTOXICATING LIQUORS—TRANSPORTATION.

Where a liquor dealer in another state sent his agent into local option territory within the state to deliver whisky to a purchaser, who had ordered and paid for it, the sale was not completed until the delivery was made, and it was therefore consummated in the prohibited district, and, under the Webb-Kenyon law (*Act March* 1, 1913, *c.* 90, 37 *Stat.* 699), prohibiting the transportation of intoxicating liquors' by any person interested therein, to be sold in violation of any law of the state to which it is sent, it was not protected by the commerce clause of the Constitution.

19. COMMERCE—SUBJECTS OF REGULATION—INTOXICATING LIQUORS—TRANSPORTATION—"ANY PERSON INTERESTED".

The term "any person interested" as used in the Webb-Kenyon law (*Act March* 1, 1913, *c.* 90, 37 *Stat.* 699), is not restricted to the consignee, or to the consignor who intends to make an' illegal sale at the destination, but includes the seller in this case, who is interested to the extent of making the delivery, since under the circumstances the loss of the liquor during shipment would have been the loss of the dealer, and not that of the purchaser.

20. INTOXICATING LIQUORS—OFFENSES—RESPONSIBILITY OF AGENT.

The agent of a liquor dealer could be convicted of the unlawful sale thereof, since any one who participates in any way in the sale of intoxicating liquor in local option territory is an accomplice, and as guilty as if he alone made the sale.

21. COMMERCE—SUBJECTS OF REGULATION—INTOXICATING LIQUORS—TRANSPORTATION.

Where a person to whom liquor is given for transportation and delivery is interested therein as agent of the seller to make the delivery, and intends when he receives the liquor to carry it from a point in one state to local option territory within another state, into which the carrying is unlawful by the laws of that state, the act is prohibited by the Webb-Kenyon law (*Act March* 1, 1913, *c.* 90, 37 *Stat.* 699), prohibiting the transportation of intoxicating liquors by any person interested therein to be used in violation of any law of the state to which it is taken.

22. COMMERCE—SUBJECTS OF REGULATION—INTOXICATING LIQUORS—TRANSPORTATION.

The Webb-Kenyon law (*Act March* 1, 1913, *c.* 90, 37 *Stat.* 699), prohibiting the transportation in interstate commerce of intoxicating liquors intended by any person interested therein to be received, sold, possessed, or in any manner used in violation of the law of the state to which it is taken, is not limited to cases where it is the intention of the consignee or of the consignor to use it in violation of the law; but interpreted broadly, to execute its manifest purpose to correct the evils existing under the Wilson act, which made

interstate shipments of liquor subject to state laws only after delivery to the consignee, it applies also to a carrier who receives a shipment of liquors to be transported to a place where such transportation is forbidden by the state law.

23. STATUTES—CONSTRUCTION—PURPOSE OF ACT.

While the intent of an act must be gathered from its language, the manifest purpose of the act and the evils it was designed to suppress may be considered in determining its meaning and intent.

24. INTOXICATING LIQUORS—SALES IN LOCAL OPTION TERRITORY—DELIVERY BY SELLER'S AGENT.

One who, as agent of a liquor dealer in another state, transports liquor into local option territory within the state, and there delivers it to a purchaser, who had ordered and paid for it, is guilty of making an unlawful sale under the local option law.

25. COMMERCE—INTOXICATING LIQUORS—POWER TO REGULATE—SUBJECTS OF REGULATION—SALE IN ORIGINAL PACKAGE.

A state can prohibit all domestic commerce in intoxicating liquors between its citizens wherever the liquor was manufactured; but it cannot, without the consent of Congress, regulate or prohibit the sale in the original packages of liquor shipped in from another state or foreign country.

26. COMMERCE—SUBJECTS OF REGULATION—TRANSPORTATION—INTOXICATING LIQUORS.

Since Congress had the authority to adopt the Wilson act, providing that interstate shipments of intoxicating liquors should become subject to state laws upon their delivery to the consignee, it could also adopt the Webb-Kenyon act (*Act March* 1, 1913, *c.* 90, 37 *Stat.* 699), prohibiting the transportation of intoxicating liquors into a state, to be used in violation of the state law, thereby divesting such shipments of their protection under the commerce clause of the federal Constitution as soon as they reach the state line.

27. COMMERCE—SUBJECTS OF REGULATION—TRANSPORTATION—INTOXICATING LIQUORS.

The Webb-Kenyon act (*Act March* 1, 1913, *c.* 90, 37 *Stat.* 699) is no more an infringement of the right to contract for an interstate shipment than the Wilson act, and if the latter was valid the former is also.

28. COMMERCE—POWER TO REGULATE—DELEGATION BY CONGRESS.

The Webb-Kenyon act (*Act March* 1, 1913, *c.* 90, 37 *Stat.* 699), prohibiting the interstate transportation of intoxicating liquors to be used in violation of law, is not a delegation of the powers of the United States to regulate interstate commerce, but is an exercise of that power by an express prohibition of certain shipments.

29. CONSTITUTIONAL LAW—"POLICE POWER".

The "police power" is inherent in the state, and is given a scope commensurate with what the Legislature reasonably believes to be necessary for the protection and preservation of the health, morals, and welfare of its citizens.

30. INTOXICATING LIQUORS—CONSTITUTIONALITY OF LAWS—PROHIBITION.

The manufacture and sale of intoxicating liquors is a subject of regulation or prohibition under the police power of the state.

31. COMMERCE—POWER TO REGULATE—DELEGATION OF POWER.

Congress may adopt a law which divests intoxicating liquor of its character as interstate commerce sooner than would otherwise be the case, for the purpose of supplementing the prohibitory laws of the state.

32. COMMERCE—METHODS OF REGULATION—TRANSPORTATION OF LIQUORS.

An act of a state regulating or prohibiting the interstate transportation of intoxicating liquors into local option territory, adopted in good faith to make more effective its laws against sales in such territory, where such transportation is substantially connected with the forbidden sale, and is also prohibited by an act of Congress, is valid under both the state and federal Constitutions.

(*October* 8, 1913.)

PENNEWILL, C. J., and BOYCE and CONRAD, J. J., sitting.

*Josiah O. Wolcott*, Attorney General, *Armon D. Chaytor, Jr.*, and *Frank M. Jones*, Deputies Attorney General, for the State.

*Daniel O. Hastings* and *Herbert H. Ward* for defendant.

Court of General Sessions, Sussex County, October Term, 1913.

INDICTMENT (No. 9, June Term, 1913) for the violation of *Chapter* 139, *Volume* 27, *Laws of Delaware*, 340, known as the "Hazel Law", by bringing as agent of a certain liquor dealer in the City of Philadelphia and State of Pennsylvania, into local option territory within the State of Delaware, to wit, Sussex County, two quarts of spirituous liquor, to wit, whisky, purchased by a resident of said county.

Case heard upon agreed statement of facts. (See *State v. Van Winkle*, *post*, also 88 *Atl.* 807.)

Before delivering the opinion, the court made the following preliminary statement:

PENNEWILL, C. J.:—The court is prepared to announce its decision upon the questions raised in the above stated case and argued at the last term, but before reading the opinion I wish to say, speaking for every member of the court, that nothing which may have been said by any one outside of this room, or since the argument, has had the slightest influence upon us in reaching our decision. It may be entirely unnecessary to make this statement, and it would not be made except for the newspaper controversy that has been recently engaged in respecting this case.

We wish to say that our decision was reached, and the opinion I am about to read was entirely prepared, at least a month ago, and before said controversy began in the public press.

[1] And inasmuch as there seems to be some misconception as to the proper function and duty of the court in deciding a case of such general interest as the present one, we desire to make this further statement: This case must be determined like any other that comes before us; that is, according to what we believe to be the law. Indeed, we have no discretion, and but one duty, which is to declare the law as we understand it. We do not make the law and have no power or right to unmake it if it was constitutionally enacted. Under our system of government the Legislature is the sole judge of what are proper subjects of legislation, subject only to constitutional limitations; and the necessity and wisdom of any particular act cannot be reviewed by the court—it is exclusively for the law-making body to decide.

What we desire to make plain is this: That the court in passing upon the validity of a statute has no discretion at all; it cannot say whether it was wise or unwise, necessary or unnecessary, proper or improper. With the wisdom, necessity or propriety of legislation we can have nothing whatever to do under our judicial oaths. The power or authority of the Legislature to pass the statute is the only question for the consideration of the court; and if the power is found to exist under the law, it absolutely controls the court. This statement has been made in order that every one may clearly understand that our duties are judicial and not legislative, and that we dare not encroach upon the prerogatives of the law-making body which is a co-ordinate branch of the state government.

## STATEMENT OF FACTS.

The General Assembly of this state at its last session (1913) enacted the following statute, commonly known as the "Hazel Law", which was approved, viz.:

"An act regulating the shipment or carrying of spirituous, vinous or malt liquor into local option territory, or the delivery of same in such territory.

"Be it enacted by the Senate and House of Representatives of the State of Delaware in General Assembly met:

"Section 1.   That it shall be unlawful for any common carrier, knowingly to accept or receive for shipment, transportation or delivery to any person or place within local option territory, or to carry, bring into, transfer to any other person, carrier or agent, handle, deliver or distribute in local option territory, any spirituous, vinous or malt liquor, regardless of the name by which it may be called.

"Section 2.   That it shall be unlawful for any person, firm or corporation engaged in the manufacture or sale of spirituous, vinous or malt liquor, or the agent, servant or employee of any such person, firm or corporation, to carry, convey or bring into local option territory, spirituous, vinous or malt liquor, regardless of the name by which it may be called, by any conveyance or means of transportation whatsoever.

"Section 3.   That any person, whether as principal, or agent, clerk or servant of another, who shall knowingly violate any of the provisions of this Act, shall upon conviction therefor be fined not less than fifty dollars, nor more than five hundred dollars for the first offense; and upon conviction for any subsequent offense, in addition to such fine shall be imprisoned for a period of not less than thirty days, nor more than six months.

"Section 4.   This Act shall apply to all packages of spirituous, vinous or malt liquor, whether broken or unbroken.   Each package of spirituous, vinous or malt liquor, regardless of the name by which it may be called, accepted, received, carried, transferred, handled, delivered or distributed in violation of the provisions of this Act, shall constitute a separate offense.   And the false or fictitious naming or labeling of any spirituous, vinous or malt liquor for shipment or delivery into local option territory, shall work a forfeiture of such liquor.

"Section 5.   Nothing in this Act shall be construed to apply to the shipment or delivery to physicians or druggists, of spirituous, vinous or malt liquor, in unbroken packages in quantity not to exceed five gallons at any one time, nor to the delivery to churches,

or the proper officers thereof, of wine in unbroken packages for sacramental purposes.

"Section 6.   That it shall be unlawful for any person to carry, bring or have brought any quantity of spirituous, vinous or malt liquor from any point within the State of Delaware into local option territory within said state greater than one gallon within the space of twenty-four hours."

Act April 8, 1913 (27 *Del. Laws*, *c.* 139).

At the June Term (1913) of the Court of General Sessions, in and for Sussex County, one William Grier was indicted for the violation of said statute, the indictment being in the following words:

"The grand inquest for the State of Delaware, and the body of Sussex County, on their oath and affirmation respectively, do present, That William Grier late of Georgetown Hundred, in the county aforesaid, on the seventeenth day of June, in the year of our Lord one thousand nine hundred and thirteen, with force and arms, at Georgetown Hundred, in the county aforesaid, he, the said William Grier, then and there being agent of a certain Tony Kayser, of the City of Philadelphia, State of Pennsylvania, the said Tony Kayser then being a person engaged in the sale of spirituous liquor, did, by a certain means of transportation, to wit, by a certain railroad train operated within the State of Delaware by Philadelphia, Baltimore and Washington Railroad Company, bring from New Castle County in the State of Delaware into local option territory within the said State of Delaware, to wit, into Sussex County aforesaid, two quarts of certain spirituous liquor, to wit, whisky, and did then and there deliver the said spirituous liquor so brought into local option territory as aforesaid to one Harley J. Conaway, the said Harley J. Conaway having theretofore purchased the said spirituous liquor from the said Tony Kayser for the sum of two dollars, lawful money of the United States of America, against the form of the Act of the General Assembly in such case made and provided, and against the peace and dignity of the State."

In order to test the validity of the statute, and secure from

Statement.

the courts a decision of the several questions that might be raised respecting its constitutionality, the following case stated was agreed upon by and between the state and the defendant, and filed, by leave of the court, on the ninth day of July, 1913:

"And now, to wit, this third day of July, A. D. 1913, it is agreed by and between Josiah O. Wolcott, Attorney General of the State of Delaware, and Daniel O. Hastings and Herbert H. Ward, attorneys for William Grier, the defendant in the above stated cause, that the following case be stated for the opinion of the court:

"That on the seventeenth day of June, A. D. 1913, and for a long time prior thereto, Tony Kayser was engaged in the sale of spirituous liquor in the City of Philadelphia, State of Pennsylvania; that on the sixteenth day of June, A. D. 1913, he received from Harley J. Conaway, a resident of Georgetown Hundred, Sussex County, and State of Delaware, a written order for two quarts of spirituous liquor, to wit, whisky, for which the said Conaway sent and the said Kayser received the sum of two dollars; that the said whisky was intended by the said Conaway to be used by him for his own consumption, and he did not intend to sell or otherwise dispose of the same; that in sending the said two quarts of whisky to the said Conaway the said Kayser employed William Grier, the defendant, as his agent for that purpose, and the said William Grier took and carried the said two quarts of whisky from the place of business of the said Tony Kayser in the City of Philadelphia, and going by a certain means of transportation, to wit, a certain railroad train operated by the Philadelphia, Baltimore and Washington Railroad Company, by a continuous route and passage from the said City of Philadelphia, through the Counties of New Castle and Kent, in the State of Delaware, to Sussex County in the State of Delaware, carried with him the said whisky into Sussex County aforesaid, where he delivered the same to the said Conaway; that the said Conaway was not then and there a physician or druggist or an officer of a church; that the said Kayser and the said Grier were then and there interested in said whisky, the said Kayser being the owner and vendor thereof, and the said Grier being the bailee thereof for

carriage as above set forth, and both intending the said whisky to be used by the said Grier in this manner, to wit, to be carried as aforesaid into Sussex County as aforesaid; that the said Sussex County was then and there a district where, under the provisions of *Article* 13 of the *Constitution* of the State of Delaware, known as the 'local option article,' the majority of the qualified voters had voted against the license and in favor of the prohibition of the manufacture and sale of spirituous, vinous and malt liquors except for medicinal and sacramental purposes. If the court shall be of the opinion upon the facts aforesaid that, under the laws of the State of Delaware and of the United States of America, a crime punishable under the laws of the State of Delaware is stated or shown to have been·committed, then judgment shall be entered against said defendant upon the verdict of the jury charged accordingly by the court upon said admitted facts; and if the court shall be of the opinion upon the facts aforesaid that, under the laws of the State of Delaware and of the United States of America, a crime punishable under the laws of the State of Delaware is not stated or shown to have been committed, then judgment shall be entered accordingly upon a verdict of 'not guilty'. The said defendant, in case of a judgment against him as aforesaid reserves the right to except to the charge of the court upon the law."

On the same day the case was fully argued by counsel for the respective parties.

The indictment above mentioned was attacked on the following grounds, viz.:

" 1.   The act of the Legislature under which the defendant is indicted is unconstitutional in that it violates *Section* 16, *Article* 2, of the state Constitution, which provides that the subject of every bill shall be expressed in its title.

" 2.   The said act is unconstitutional, in that *Section* 5 violates the fourteenth amendment of the federal Constitution, which provides that 'No state shall  *  *  *  deny to any person within its jurisdiction the equal protection of the laws.'

" 3.   The said act is unconstitutional, in that a portion of it, at least, abridges the privileges of citizens, which are guaranteed by the fourteenth amendment of the federal Constitution.

Statement—Opinion.

"4.  Whisky is an article of commerce, and in this case is interstate commerce, and as such cannot be subject to state law.

"5.  The federal law, known as the Webb-Kenyon act, does not rob the shipment in question from the protection of the interstate commerce law, because it was intended by the consignee to be used for a lawful purpose.

"6.  If the Webb-Kenyon act was applicable to the case, the state cannot succeed, because the act is unconstitutional."

The federal law, known as the Webb-Kenyon act, is in the following language:

"An act divesting intoxicating liquors of their interstate character in certain cases.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled:

"That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State, Territory or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, into any other State, Territory or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, or from any foreign country into any State, Territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, is hereby prohibited."

Act March 1, 1913, 37 *Stat.* 699.

PENNEWILL, C. J., after stating the facts as above, delivered the opinion of the court as follows:

We will consider the grounds or propositions contended for by the defendant in the order in which they were argued.

*First.*  Is the act of the Legislature under which the defend-

ant was indicted unconstitutional in that it violates *Section* 16, *Article* 2, of the *Constitution* of this state, which provides that the subject of every bill shall be expressed in its title? *Section* 16 of *Article* 2 of the *Constitution* is as follows:

"No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title."

It is not claimed by the defendant that the act embraces more than one subject, his contention being that it is in violation of said constitutional provision because the subject of the bill, namely, "prohibition", is not expressed in its title.

[2]   The defendant cited authorities to support the proposition that "the subject in an act can be no broader than the statement of it in the title." It will be conceded that the contention is sound if by "broader" is meant that the subject is so broad that the title does not fairly express it. After all, the question is—does the title express the subject of the bill?

This principle contended for by the defendant is very clearly expressed in *Lewis' Sutherland, Statutory Construction*, § 120, as follows:

"An act will not be so construed as to extend its operation beyond the purpose expressed in the title. * * * The title must express the subject, and comprehensively enough to include all the provisions in the body of the act. * * * The title cannot be enlarged by construction when too narrow to cover all the provisions in the enacting part."

The same general principle is stated by Mr. Cooley in his *Constitutional Limitations* at 149 as follows:

"The courts cannot enlarge the scope of the title; they are vested with no dispensing power; the Constitution has made the title the conclusive index to the legislative intent as to what shall have operation; it is no answer to say that the title might have been made more comprehensive, if in fact the Legislature have not seen fit to make it so."

Such principles are not disputed.

[3]   It is hardly necessary to say that the courts of this state have uniformly held that an act of the Legislature, when attacked

Opinion.

on constitutional grounds, should be declared valid if it is possible under the law to do so. No state has gone further than our own in upholding and carrying out the will of the people as expressed through legislative enactments.

In the case of *State v. Wickenhoefer*, 6 *Penn.* 120, 64 *Atl.* 273, this court said: "It is hardly necessary for us to state that every statute is presumed to be constitutional, and that courts should not declare one to be unconstitutional unless it is clear that it is so. If there is a doubt in the mind of the court the expressed will of the Legislature should be sustained. Courts should be diligent to discover some ground upon which they can uphold the validity of the statute, and if upon a careful examination of the entire act such ground sufficiently appears, the law must be sustained. The party who wishes a court to pronounce a law unconstitutional takes upon himself the burden of proving, beyond all doubt, that it is so."

[4]   In the very recent case of *Monaghan v. Lewis*, 5 *Penn.* 218, 59 *Atl.* 948, 10 *Ann. Cas.* 1048, the court used the following language respecting the constitutional requirement that the subject of a bill shall be expressed in its title, viz.:

"While such construction should be given to this provision as will prevent the evils it was intended to remedy, it should not be so construed as to defeat or embarrass legislation where there has been a substantial compliance with its requirements. Where it is possible, it should be so construed as to uphold rather than destroy legislation.   *   *   *   The Constitution does not require that the title should do more than state in general terms the subject of the act; it need not go into details or furnish an abstract, synopsis or index of the contents of the act."

[5]   Applying the foregoing general principles to the question before us, is the act in question unconstitutional because of its title?

The title is "An act regulating the shipment or carrying of spirituous, vinous or malt liquors into local option territory, or the delivery of same in such territory."

*Section* 1 prohibits common carriers from accepting for shipment or delivering such liquors into local option territory, and

*section* 2, under which the indictment was found, prohibits any person, firm or corporation engaged in the manufacture or sale of such liquor, or its agent, servant or employee, from carrying or delivering the same into local option territory.

It is not contended that any other section contains a subject which is not expressed in the title of the act, the argument of defendant, so far as the point now under consideration is concerned, being based entirely upon the prohibitory features of *sections* 1 and 2.

[6, 7] It must be conceded that the first and second sections are prohibitory in their character and effect, and it must also be conceded that, ordinarily, prohibition has a different meaning from regulation. It is true that lexicographers give it a different meaning. The two words do not necessarily mean the same thing. If the two sections constituted the entire act there would be much force in the defendant's argument. But the language of the whole act must be considered, as well as its manifest purpose and scope. And, moreover, in dealing with the title the court will take judicial notice of the laws and conditions respecting intoxicating liquors existing in this state at the time of the passage of the act.

Sussex County, in which the alleged offense was committed, was then local option territory; that is, it was a district in which it was unlawful to manufacture or sell spirituous, vinous or malt liquors except for medicinal and sacramental purposes. It was, therefore, the intention of the Legislature to prevent, so far as possible, the bringing into this local option territory such liquors under circumstances that would indicate a purpose, or make it possible to violate the existing law. The act permits any person to bring or carry into such territory a small quantity of liquor, to wit, one gallon, within the space of any twenty-four hours. And the act does not prevent the shipment or delivery to physicians or druggists in a quantity not exceeding five gallons at any one time, nor the delivery to churches in unbroken packages for sacramental purposes.

The effect of the local option election held several years ago was to make the sale and manufacture of spirituous, vinous and malt liquors unlawful in Sussex and Kent Counties, but it did not

prevent the *shipment* or *bringing into* those counties of such liquors, in any quantities, and by any means. It only prohibited their sale therein. In order to make the existing laws more effective, and assist in carrying out the expressed will of the people, the Legislature undertook, by the act under consideration, to regulate the importation of liquors into this local option territory. Manifestly the Legislature believed that more good would be accomplished, and the existing laws would be more effective, if the importation was not entirely prohibited. They were not disposed to interfere with the use of the liquors for medicinal or sacramental purposes, and they could not if they would, because the Constitution recognized such right. And they evidently thought it would be better to permit the individual to bring into the local option territory a small quantity of liquor in any one day. But this privilege or exemption was restricted to the individual himself, and denied to liquor dealers and common carriers. The purpose is obvious, and the discrimination, the state contends, was entirely proper under the circumstances. The controlling thought and purpose was, that no liquor should be sold in Kent or Sussex Counties, but there was a fear in the mind of the Legislature that if the law was made so rigid as to prevent the individual from securing liquor in any way or in any quantity, the effect would be that the existing law would become so unpopular as to be incapable of enforcement. Therefore the bringing in of small quantities by individuals was made permissible, and the right of shipment and delivery in larger quantities to physicians, druggists and churches was recognized.

To that extent the statute is clearly and purely regulatory, and this is not really disputed by the defendant.

[8] The Legislature did not attempt to prevent or prohibit entirely the bringing of liquors into local option territory, but rather to regulate it by providing by whom and in what quantities it should be brought. Such was undoubtedly the legislative scheme and intent, and the statute taken as a whole cannot be regarded as a prohibitory statute. The purpose being that only individuals, physicians, druggists and churches should have the right to bring in liquors, it was necessary in the fulfillment of the

legislative scheme that the act should clearly designate those who should not have the right. It was therefore provided in *sections* 1 and 2 that common carriers and liquor dealers should not have such right; and if such classification was legal, which will be considered later in this opinion, we think the Legislature had the authority under the police powers of the state, to make such provision. As before observed, Kent and Sussex Counties were dry territory, made so by the vote of the people, and the state had a right to enact such legislation as would prevent the sale of liquors in those counties. The Legislature evidently believed that if common carriers could transport and deliver it, and liquor dealers could ship, carry and deliver it, the temptation and opportunity to sell it in the Counties of Kent and Sussex would be increased, and its sale could not be prevented or detected. Whether the Legislature reasoned correctly or not is not for the court to determine because the Legislature was the sole judge of the danger, and the necessity for the legislation.

The general subject of the act being the carrying and delivery of liquor into local option territory, is there anything in the act which is not germane and pertinent to such general subject? Under the law of this state such is the test.

In the recent case of *Clendaniel v. Conrad et al.*, 3 *Boyce* 549, 83 *Atl.* 1036, the Supreme Court, in dealing with a constitutional question similar to the one before us, said:

"The authorities all agree that if the provisions of the act relate directly or indirectly to the same subject, are naturally connected, and are not foreign to the subject expressed in the title, they will not be held unconstitutional, as in violation of the provision under consideration. It is not violated by any act having various details properly pertinent and germane to one general subject."

Judged by such a test we are clearly of the opinion that the act in question is not unconstitutional because of its title. The prohibition against common carriers and liquor dealers we think was pertinent and germane to the general subject of regulation. The term "regulation" must be broadly construed, and when so construed it is sufficient to cover the particular prohibitions con-

tained in the act. Such prohibitions were only a part, and a natural and essential part of the scheme or design the Legislature sought to accomplish, viz., the general regulation of carrying liquor from points outside to points inside of local option territory. And the Legislature endeavored to regulate such carrying by providing in what quantities, and by whom and for whom, it might be carried, and by whom it should not be carried. Such was the purpose, and it was all covered by the general subject of regulation. We are convinced that any intelligent person who understood that such was the subject and intent of the act would not be surprised at the prohibitions. On the contrary, he would be impressed, as we are, with the fact that the different provisions of the act relate directly or indirectly to the same subject, are naturally connected and not foreign. In order to meet the objections of the defendant the title would have to be "An act to regulate and prohibit," etc. This we think would be not only unnecessary but contradictory and inconsistent.

We do not think it necessary to comment at length upon the authorites cited by the defendant. Indeed, they do not seem to us to be in point. Most of them are cases where the subject expressed in the title was regulation and the act itself was *solely* prohibition. In some of the cases the existing conditions were dissimilar to ours in this, that the sale of intoxicating liquor was lawful and the legislation proposed was local option. The object sought to be accomplished was prohibition in the district, and in no sense and to no extent was regulation the subject or intent of the act.

To show that "regulate" does not mean "prohibit" the defendant gives Webster's definitions of the two words, one definition of regulate being—"To subject to rules or restrictions; as to regulate trade, to regulate diet."

We think such a broad meaning given to the word is an authority or justification for holding that "regulate" is general enough in its signification to include the prohibitions contained in the act. Certainly no one will contend that a regulation of diet would not be exclusive as well as inclusive. To regulate diet, as the term is ordinarily used and understood, necessarily means

that certain articles may be eaten and others may not be. Some things are permissible and some are prohibited. The illustration is very apt and persuasive.

We have examined the cases cited by the defendant with a good deal of care and are satisfied that not one of them is opposed to the conclusion we have reached. They are all based upon the reasoning that there can be no regulation of a business absolutely prohibited. In such a case there is nothing to regulate. In *Woolen & Thornton on Intoxicating Liquors*, § 278, it is said: "While the power to 'regulate' does not authorize prohibition in the general sense, because the very essence of regulation is the existence of something to be regulated, yet the weight of authority is to the effect that this power does confer the authority to confine the business to certain hours of the day, to certain localities or buildings," etc.

According to this authority, therefore, if the business exists its regulation may entail its prohibition to some extent and in some respects.

In the case of *Cantril v. Sainer*, 59 *Iowa*, 26, 12 *N. W.* 753, the court said: "The subject as found in the body of the ordinance is entirely prohibitory. There is no pretense at regulation. Its whole scope is an absolute prohibition," etc.

In *People v. Gadway*, 61 *Mich.* 286, 28 *N. W.* 101, 1 *Am. St. Rep.* 578, the act entirely prohibited the traffic within a certain limited territory; no person could sell therein.

The two cases we have mentioned were considered by the defendant strong authorities in support of his contention, but the authority chiefly relied upon, and which reviews almost all the cases on the point, and approves the decision previously made in *People v. Gadway*, is *In 're Hauck*, reported in 70 *Mich.* 396, 38 *N. W.* 269.

A more extended reference to this case will make it unnecessary to comment at length upon any other.

The title of the act was, "An act to regulate the manufacture and sale of malt, brewed, or fermented, spirituous and vinous liquors in the several counties of this state."

When the statute was enacted, the sale of liquors was lawful

under certain restrictions. Any one could engage in the business upon complying with the restrictions. The act provided for a vote upon the manufacture and sale of intoxicating liquors, and prohibited such manufacture and sale if the vote on the question should be against it.

The court said: "It is apparent that the object of the act is to prohibit the manufacture and sale of liquors to be used as a beverage. There is no attempt by the Legislature to disguise the object in the body of the act."

The Attorney General in that case conceded that absolute prohibition could not be enacted under a title to regulate, but insisted that under a title to regulate it was competent to prohibit the sale of liquors to specified classes of persons, at specified times and places, and in specified quantities.

It was further insisted "that the act regulates the manufacture and sale of liquors mentioned in the title in the counties voting a certain way under the act, by prohibiting such manufacture and sale, 'except where done by a druggist who is or who employs a registered pharmacist,' and that one means adopted by the Legislature to regulate this traffic is partial prohibition."

The court said: "This reasoning is wholly untenable as applied to the act in question. Druggists are not allowed to sell liquor to be used as a beverage. They are permitted by the general law to sell liquors for medicinal, mechanical, and sacramental purposes only. These sales were and are already regulated by existing general laws. This act does not pretend to regulate druggists. It simply excepts them from the operation of the act, and permits them to carry on their business under the general laws. This act, when enforced, suspends the general laws as to all other persons, and wholly prohibits them from carrying on the business. This is not regulation by partial prohibition, but is total prohibition to all persons who by general law are authorized thereunder to sell liquors to be used as a beverage. If the position assumed is correct, then, under a law entitled to regulate the sale of vinous and spirituous, brewed, or fermented liquors, an act might be passed totally prohibiting the sale of such liquors except for sacramental purposes; and it would not be a prohibitory law,

but a law to regulate by partial prohibition. This would be absurd. The act is total prohibition, so far as concerns the manufacture or sale of intoxicating liquors."

This case is regarded by the defendant as the strongest authority in support of his contention, and "exactly like the one now before the court." But it appears upon examination, to be very different, and the reasoning of the court favors the contention of the state.

It is obvious, from a careful reading of the opinion that if the act had permitted certain persons or classes to sell liquors to be used as a beverage it would have been valid even if it was prohibitory as to others. In other words, the court practically said, that if the title of an act is to *regulate* and the body of the act both regulates and prohibits, it is both regulation and partial prohibition, and not obnoxious to the constitutional provision.

And this is exactly the character of the act in question. Its substance is regulation, and general regulation, because it permits all individuals to carry liquors in certain quantities and at certain intervals; but it is in a sense also partial prohibition, because it makes the carrying of liquors by certain classes unlawful. Even under the reasoning of the authorities cited by the defendant we think the act before us is not unconstitutional on account of its title.

The defendant cited as an authority in his favor the Delaware case of *State v. Ferschke*, 2 *Boyce*, 477, 81 *Atl.* 481. This case, in respect to its title, seems to us to be almost the opposite of the one now before the court. In the *Ferschke case* the title was held to be too restricted to embrace one of the subjects of the bill. In the present case the title is regarded as very general, and comprehensive enough to embrace every subject in the bill.

We have discussed defendant's first proposition at considerable length because it was upon that his counsel seemed to mainly rely at the argument.

The defendant's second proposition is:

"That said act is unconstitutional in that *section* 5 violates the fourteenth amendment of the federal Constitution, which provides that 'No state shall * * * deny to any person within its jurisdiction the equal protection of the laws'."

Opinion.

*Section* 5 of the act reads as follows:

"Nothing in this act shall be construed to apply to the shipment or delivery to physicians or druggists of spirituous, vinous or malt liquor, in unbroken packages in quantity not to exceed five gallons at any one time, nor to the delivery to churches, or the proper officers thereof, of wine in unbroken packages for sacramental purposes."

The defendant's contention, is that this section is class legislation, discriminating against some citizens and favoring others, and is therefore within the inhibition of said amendment. It may be stated as a general proposition that the Legislature is the best and only judge of the policy of a proposed discrimination.

[9]   In determining whether a certain classification is or is not violative of said constitutional provision, this court, in the case of *State v. Wickenhoefer, supra,* said:

"Is such a classification of the persons or companies who are to be exempt from the operation of the statute arbitrary and unreasonable under the conditions which the Legislature believed to exist? Is it not possible for this court to say there was a fair reason for the exception? Does not the classification rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification was proposed? *Chicago v. Netcher,* 183 *Ill.* 104, 55 *N. E.* 707, 48 *L. R. A.* 261, 75 *Am. St. Rep.* 93; *Gundling v. Chicago,* 177 *U. S.* 183, 20 *Sup. Ct.* 633, 44 *L. Ed.* 725.

"This, according to all the authorities, is the test, and by it the present question must be determined." *Chicago v. Netcher,* 183 *Ill.* 104, 55 *N. E.* 707, 48 *L. R. A.* 261, 75 *Am. St. Rep.* 93; *Gundling v. Chicago,* 177 *U. S.* 183, 20 *Sup. Ct.* 633, 44 *L. Ed.* 725.

[10]   Applying this principle to the case at bar is the classification or exception in *section* 5 obnoxious to the fourteenth amendment of the federal Constitution?

There were two classes of persons excepted from the provisions of the act, viz.: (1) Physicians and druggists; and (2) churches. In respect to physicians and druggists nothing is provided by the act as to the use of the liquors, while churches are required to use them for sacramental purposes.

The defendant concedes that the classification made with respect to churches and their officers was reasonable and constitutional, because they could use the liquors only for sacramental purposes, but insists that the exception of physicians and druggists was arbitrary and unreasonable because they are not limited by the act, in the use of the liquors, to medicinal purposes.

It is not, however, seriously contended that the classification with respect to druggists was arbitrary and unreasonable, because the defendant admits that under the law existing at the time of the passage of the act, druggists could sell liquors only for medicinal purposes, and practically concedes that if they could sell only for such purposes their exception from the provisions of the act was not unreasonable. This concession is made because it is immaterial whether the act in question confines the use for which liquors may be sold by druggists to medicinal purposes or not, inasmuch as they could sell only for such purposes because of the provisions of an act passed in 1911, entitled "An act regulating the sale of intoxicating liquors for medicinal purposes." 26 *Del. Laws*, c. 147. This may be termed a prescription act. But whatever admissions may be made respecting the exception of churches and druggists, it is strongly urged that the exception of physicians constitutes a favored class, and is therefore an arbitrary and unreasonable classification. This contention is based upon the assumption that physicians are not required to use the liquors they may receive for medicinal purposes, and that they are not required to sell or use them in any way different from other persons.

The following is, briefly, the argument of the defendant upon this point: The act prohibits common carriers and liquor dealers from carrying or delivering liquors into local option territory under any circumstances. It prevents any person from carrying into such territory more than a gallon of liquor in twenty-four hours; and these prohibitions are regardless of the use to be made of such liquors after delivery. There is no law that prohibits the use of the liquor, and therefore every citizen has a right to use it in a proper manner. Physicians are permitted by the act to receive as much as five gallons at any one time, and are not re-

quired to use it for medicinal purposes, nor are they restricted as to its use in any way. The Legislature, therefore, has selected physicians as a particular class, and made them a favored class. The act restricts other citizens in rights which they formerly enjoyed but not physicians. Such legislation cannot be anything but arbitrary and unreasonable. The words "for medicinal purposes" cannot be read into the law as applying to physicians. Such being the case they cannot be selected as a proper class to exempt from the operation of the law, without thereby denying to other citizens the equal protection of the laws.

[11] Such is the argument, and the conclusion reached by the defendant may perhaps be warranted from the premises assumed. But we are unable to agree that physicians are not restricted in the use of the liquor they may receive. Nor do we agree that under the laws existing at the time of the passage of the act in question druggists alone sold or used liquor for medicinal purposes. Physicians may, and very often do, administer medicines to their patients without writing a prescription. If a physician does write a prescription it is of course governed by the statute passed in 1911, but if he administers or furnishes the medicine himself that statute does not apply. It is in fact a prescription statute only, and does not take away from physicians the right to furnish liquor to their patients for medicinal purposes. We have never known such right questioned before. Indeed we have assumed that it was generally conceded that such right existed not only under general law but was also broadly recognized by the Constitution. When the Constitution provided that, if the manufacture and sale of liquor in any local option district should be made unlawful by popular vote, it might still be sold for medicinal purposes, it meant that it might be so sold by physicians and druggists, according to the provisions of existing laws. If liquors are to be sold for medicinal purposes, logically and necessarily physicians and druggists, and they only, should have the right to sell them for such purposes. If liquor is recognized and treated by the law as a medicine, then its use and sale as such is made a part of the business of physicians and druggists, and only of physicians and druggists. The Legislature may regulate

such sale but we very much doubt that it could absolutely pro-
hibit it by either physicians or druggists in view of the constitu-
tional provision to which we have referred.

When the Legislature, by the act in question, provided that
druggists and physicians might receive by shipment and delivery a
quantity of liquor not exceeding five gallons at any one time, it
was meant to be received for medicinal purposes only. This is
admitted in respect to druggists, and there can be no doubt
that the same privilege, and no greater, was accorded to physi-
cians. Druggists and physicians were inseparable in the legisla-
tive mind as to their use of intoxicating liquor. It was not neces-
sary to use the words—"for medicinal purposes", because druggists
could not use the liquor for any other purpose, and neither could
physicians. If the Legislature intended that druggists should use
it for medicinal purposes only, as they manifestly did, then they
must have had the same intention with respect to physicians,
whose sole business is the prescribing and administering of
medicines.

It is true that before the sale of liquor was prohibited in Kent
and Sussex Counties it was unlawful for any person, other than a
licensed liquor dealer or druggist, to sell intoxicating liquor, but
there was no law that prevented physicians from using such
liquor as a medicine in the legitimate practice of their profession.
After the local option law became effective there was no express
authority for the sale of intoxicating liquor by druggists in Kent
and Sussex Counties until the enactment of the prescription law
in 1911. But before the passage of the prescription law the court,
in Kent County at least, granted licenses to druggists to sell
liquor for medicinal purposes, upon the assumption, that inas-
much as the Constitution provided that liquor might be sold for
medicinal purposes, it was intended that druggists should have
that right. For the same reason we hold that physicians are
authorized to use intoxicating liquor for a like purpose, and that
such right was contemplated by the Legislature in the passage of
the act in question.

We may mention the further significant fact, that before the
passage of the prescription act, as well as since, the Attorney

General, in framing his indictments in liquor cases, has invariably incorporated an averment that the liquor alleged to have been sold was not sold for medicinal or sacramental purposes, thereby recognizing the fact that sales for such purposes were authorized by the Constitution.

[12] Although the Constitution authorizes the sale of intoxicating liquor for medicinal purposes, it does not mean that all persons should have the right to sell. The plain, common-sense and reasonable construction of the provision is that only those persons should have the right who were licensed to sell, prescribe or administer medicines, to wit, druggists and physicians.

There can be no doubt that the Legislature, in passing the law now under consideration, intended to make druggists and physicians a separate and distinct class, who should have the right to receive liquor in quantities not exceeding five gallons; and there can be as little doubt, we think, that it was also intended that the liquor so received should be used by druggists and physicians in the same way, that is, for medicinal purposes and for such purposes only.

If such is the intent and meaning of the statute, the classification is admittedly constitutional, for it is not denied that the provision now under consideration would be legal and valid if the words—"for medicinal purposes", had been inserted.

Our conclusion being that physicians are required to use for medicinal purposes the liquors they may receive, it is unnecessary to discuss the question whether the classification is a reasonable one in view of the manifest purposes of the act, and a valid exercise of the police power under the conditions which the Legislature believed to exist; or whether it is an arbitrary classification unfounded in reason and fact. We have already adverted to this subject in considering defendant's first proposition; but it is not denied that the exemption of physicians is reasonable if they are required to use the liquors they may receive for medicinal purposes only. In that case the classification is analogous to druggists and churches under the act, and such classifications are admitted by the defendant not to be arbitrary or unreasonable because the purposes for which they may use them are proper and reasonable:

Upon the general subject of classification we quote the following language from an opinion delivered by Mr. Justice Holmes in the case of *M., K. & T. Ry. Co. v. May*, 194 *U. S.* 267, 24 *Sup. Ct.* 638, 48 *L. Ed.* 971:

"In regard to the manner in which such a question should be approached, it is obvious that the Legislature is the only judge of the policy of a proposed discrimination. * * * When a state Legislature has declared that in its opinion policy requires a certain measure, its action should not be disturbed by the court under the fourteenth amendment, unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched. * * * Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that Legislatures are" as capable of judging what is for the best interest "of the people in quite as great a degree as the courts."

The defendant's third proposition is that the act in question is unconstitutional in that a portion of it, at least, abridges the privileges of citizens, which are guaranteed by the fourteenth amendment of the federal Constitution.

This proposition he says applies more directly to *section* 6 of the act, which reads as follows:

"That it shall be unlawful for any person to carry, bring or have brought any quantity of spirituous, vinous, or malt liquors from any point within the State of Delaware into local option territory within said state greater than one gallon within the space of twenty-four hours."

The defendant does "not dispute the fact that the Legislature may impose such conditions on the liquor dealers in this state as it may deem proper. If *section* 2 is confined to liquor dealers licensed under the laws of this state, it may be that it does not abridge the privilege of citizens but is merely a further restriction placed upon a licensed business."

This quotation is taken from defendant's brief. But he insists that, because in the present case the liquor dealer is not within the jurisdiction of the Delaware Legislature, the courts

can have no jurisdiction over him or his agents until they come into the state, and that while the defendant came into the state as agent of such liquor dealer, he did so not for the purpose of making a sale, but for the purpose of making delivery of property which the purchaser had a right to use when received by him. It is also insisted that, if *section* 6 of the act abridges the privileges of citizens, then to punish the defendant, under the facts in the case, is an abridgment also, because having no authority over his principal as a dealer the state can have no authority over his agent who is doing nothing more than conveying property to its owner under such circumstances as the owner would himself have the right to do.

We confess we do not clearly understand the exact point here sought to be made, but we infer from the authorities cited that the contention is that the defendant had a right to receive and have in his possession in Sussex County, for the purchaser, the two quarts of liquor, for the carrying of which he was indicted.

We can see no possible connection between this point and *section* 6, which makes the carrying into local option territory of a quantity of liquor greater than one gallon unlawful, inasmuch as the defendant was indicted for carrying only half that quantity.

But in order to carry out the real purpose of the case stated, which is to secure an adjudication of all the questions that might be raised touching the constitutionality of the act, we will assume that the real point involved in defendant's third proposition is, either that *section* 6 prevents any person from carrying more than one gallon of liquor for any purpose, or that *section* 2 prevents any liquor dealer, or his agent, from carrying any quantity of liquor for any purpose whatever.

We will enter into no discussion of the authorities cited by the defendant in support of his third proposition for, with one possible exception, they do not seem to be applicable to the present case.

The principle declared, as well as the reasoning in all those cases, is the same, and is well expressed by *Black* in his work on *Intoxicating Liquors*, § 38 (50), as follows:

"But it is justly held that a provision in such a law that no

person without a state license shall 'keep in his possession, for another, spirituous liquors,' is unconstitutional and void. The keeping of liquors in his possession by a person, whether for himself or for another, unless he does so for the illegal sale of it, or for some other improper purpose, can by no possibility injure or affect the health, morals or safety of the public, and therefore the statute prohibiting such keeping in possession is not a legitimate exertion of the police power. It is an abridgment of the privileges and immunities of the citizen without any legal justification, and therefore void."

To the same effect is *Com. v. Campbell*, 133 *Ky*. 50, 117 *S. W.* 383, 24 *L. R. A. (N. . S.)* 172, 19 *Ann. Cas.* 159; *State v. Williams*, 146 *N. C.* 618, 61 *S. E.* 61, 17 *L. R. A. (N. S.)* 299, 14 *Ann. Cas.* 562; *State v. Gilman*, 33 *W. Va.* 146, 10 *S. E.* 286, 6 *L. R. A.* 847; *Eidge v. City of Bessemer*, 164 *Ala.* 599, 51 *South.* 246, 26 *L. R. A. (N. S.)* 394.

In the last mentioned case the decision was, that intoxicating liquors were property which the citizen has a constitutional right to possess and keep for innocent and lawful purposes. In the Kentucky case the sole charge against the defendant was that he had the liquor in his possession; "therefore," said the court, "we must presume that he had it there for a lawful purpose, if he could so hold it."

The North Carolina case is interesting, not only on account of the reasoning of the court, but also because it comes much closer to the present case than any other cited by the defendant.

The court said: "While the Legislatures have resorted to many expedients to control, regulate, restrict and prohibit the manufacture and sale [of intoxicating liquor], either in entire states or counties, towns, cities or districts, we do not anywhere find any suggestion that the possession of intoxicating liquor without any unlawful purpose, or carrying it into the territory wherever its sale is prohibited, with no unlawful purpose, is made indictable."

The court, however, adds this qualifying statement: "While by no means decisive of the power to do so, the fact that no such attempt has been made is worthy of note in seeking the basis of the asserted power."

The North Carolina statute made it unlawful for any person to bring into the County of Burke in any one day more than one-half gallon of spirituous, vinous or malt liquors, except for the purpose of delivery to a druggist for medicinal purposes. It was for the violation of that statute that the defendant was indicted. The court, after a somewhat elaborate discussion of the question before them, said: "Assuming that the wine or spirits described in the bill of indictment was the defendant's property, the fruits of his labor, he was entitled to carry it with him whithersoever he went unless in doing so, he injuriously affected the public morals, health or safety, or that his doing so was so reasonably related to the sale of intoxicating liquor, which is the thing prohibited in Burke County, as to come within the police power." It was held that the prohibition was not within the police power.

In the West Virginia case the act made unlawful was the keeping of intoxicating liquor in his possession by any person. The court held that the statute was an abridgment of one of the citizen's fundamental and indefeasible rights, viz., the right to acquire and possess property of every kind which is not injurious to the lives, health or safety of the poeple. In the course of a rather long opinion the court said:

"If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of courts to so adjudge. * * * The keeping of liquors in his possession by a person, whether for himself or for another, unless he does so for the illegal sale of it, or for some other improper purpose, can by no possibility injure or affect the health, morals, or safety of the public; and, therefore, the statute prohibiting such keeping in possession is not a legitimate exercise of the police power. It is an abridgment of the privileges and immunities of the citizen without any legal justification, and therefore void."

The statute in the Alabama case also prohibited the "possession of intoxicating liquors," and was held void, the court declaring, as before stated, that "intoxicating liquors were property which

the citizen had a constitutional right to possess and keep for innocent and lawful purposes."

We find that the court which decided the Alabama case, in the later case of *Williams v. State*, 60 *South*, 903, used the following language in order to remove a misapprehension created by the former decision, viz.: "There is no denial of the right of the Legislature to enact statutes, to prohibit traffic in intoxicating liquors, and such  *  *  * statutes to prevent evasions as have real and substantial relation to the purpose of prohibition without invading rights secured by the fundamental law.  *  *  * The validity of laws prohibiting the traffic in intoxicating liquors being conceded, it is obvious that the keeping for sale and the conveyance or transportation for another may not only operate in aid of evasions of the law prohibiting the traffic, but in ordinary cases will constitute integral and necessary elements of the thing prohibited."

We cannot see that *Vance v. Vandercook* (*No.* 1) 170 *U. S.* 438, 18 *Sup. Ct.* 674, 42 *L. Ed.* 1100, has any application or pertinency at all to the present case.

Such are the cases cited by the defendant in support of his third proposition, and none of them are in point except *State v. Williams*,—the North Carolina case, in which the prohibition was not against *liquor dealers* but all *persons*. In all the other cases the thing prohibited was the *possession* by any person, for himself or for another, of intoxicating liquors in dry territory. That question is not raised in the present case, and it is not the offense for which the defendant is indicted. We express no opinion on the question, and are not required to approve or disapprove the decisions made in those cases.

[13] The principal question we have to decide, is whether *section* 6, which prohibits any person from carrying or bringing from any point within the state into local option territory within the state a quantity of liquor greater than one gallon within the space of twenty-four hours, abridges any privilege of the citizen which is guaranteed by the fourteenth amendment to the federal Constitution.

[14] It is admitted by the defendant, and conceded by all

the authorities cited, that such a prohibition is constitutional if it
is a legitimate exercise of the police powers or the state.  And, it
is further admitted and conceded that it is a legitimate and valid
exercise of such powers if the thing prohibited bore a real, substan-
tial and reasonable relation to the sale of intoxicating liquors in
local option territory.  Or, as the rule is sometimes expressed,
analogous to that of classification, the act prohibited must bear a
reasonable and just relation to the act in respect to which it was
proposed, to wit, the sale of liquor in local option territory.

Such is the test of the validity of *section* 6 of the act in
question.

In the Kentucky case cited by defendant the court used this
language: "Nothing that we have said herein is in derogation of
the power of the state under the Constitution to regulate the sale
of liquor, or any use of it which in itself is inimical to the public
health, morals, or safety."  And in *State v. Williams*, already re-
ferred to, it was said: "The courts, both state and federal, have
been called on to construe, interpret and pass upon the validity
of many of the statutes.  They have, with remarkable uniformity,
sustained them, and, when of doubtful meaning, given them such
interpretation as would suppress the evil and advance the
remedy."

We are content to accept these two quotations as a fair and
correct statement of the law and the attitude of the courts.

We start then with a strong presumption in favor of the con-
stitutionality of the statute, and with the settled law that the state
has the right under its police powers to enact such legislation as is
reasonably necessary to promote and protect the lives, morals and
safety of its citizens.  It is also admitted law that the state has
the right to decide whether the evil exists and what legislation is
necessary to suppress or cure it, that is, what the remedy shall be,
and such decision will not be reversed or disturbed by the courts
unless the legislation proposed is manifestly unreasonable and
unwarranted, and a palpable invasion of the rights secured by the
fundamental law.

We have already in this opinion discussed to some extent the
reasonableness and propriety of the provisions of the act in ques-

tion, and have decided that the classifications made were not arbitrary or unreasonable considering the evils the Legislature believed to exist and the remedies required to suppress or cure them. The law applicable to classification, and to the abridgment of the citizen's privileges, is very much the same. In both cases the legislation must be reasonable, and bear a real and substantial relation to the act which the Legislature seeks to prevent. We do not wish to repeat here what we have already said any further than to call attention to the fact that Sussex County, where the alleged offense was committed, was at the time of the passage of the act in question local option territory; that the manifest purpose of the Legislature in passing the act was to stop the sale of liquor in territory where it was unlawful; that the Legislature, or the people, have the right to suppress the sale of intoxicating liquor in any district on the ground that such sale is detrimental to the health, morals or safety of the people; that to further such object, and make the existing laws against the sale of liquor more effective, the Legislature had the right to enact such laws as were reasonably and substantially related to the sale of liquor. Accordingly it was made unlawful, by the act in question, for any person, with certain exceptions, to carry, bring or have brought into Kent or Sussex County—local option territory—more than one gallon of liquor within the space of twenty-four hours. The Legislature evidently believed that liquor was being brought from other points in the state and sold in said counties; and they also believed that if the bringing into those counties of more than the specified quantity, in the specified time, could be prevented, the unlawful selling would be stopped or materially diminished. Who can knowingly say the Legislature were not right in their belief? If they were right then *section* 6 of the act is sufficiently connected with, and related to, the unlawful act of selling liquor which the law was designed to prevent, and was a legitimate and valid exercise of the police power. In view of the conditions existing at the time, we are of the opinion it was not unreasonable for the Legislature to believe that the prevention of the bringing into Kent and Sussex Counties of liquor in quantities greater then one gallon within the space of twenty-

four hours would materially affect the sale in those counties. The same reasoning applies to *section* 2 of the act, although we do not concede that the carrying of intoxicating liquor into local option territory by a liquor dealer or his agent is one of the citizen's constitutional and fundamental privileges. *Delamater v. S. Dak.*, 205 *U. S.* 97, 27 *Sup. Ct.* 447, 51 *L. Ed.* 724, 10 *Ann. Cas.* 733; *Rose v. State*, 4 *Ga. App.* 588, 62 *S. E.* 117; *State v. Davis*, 84 *S. C.* 512, 66 *S. E.* 875; *State v. Miller*, 66 *W. Va.* 436, 66 *S. E.* 522, 19 *Ann. Cas.* 604; *State v. Bass Co.*, 104 *Me.* 295, 71 *Atl.* 894, 20 *L. R. A.* (*N. S.*) 495; *Zinn v. State*, 88 *Ark.* 273, 114 *S. W.* 227.

[15] *Section* 2 of the act makes it unlawful for any liquor dealer or his agent to carry, convey or bring into local option territory any spirituous, vinous or malt liquor. We are not dealing with classification now, but with the abridgment of the citizen's privileges. Neither are we dealing with the liquor dealer as an individual, but only as engaged in the liquor business. As an individual, and in his private capacity, he has the right to bring or carry into local option territory a quantity of liquor not exceeding one gallon just as any other person. The Legislature thought that if the liquor dealer was permitted, in the conduct and furtherance of his business, to carry, convey or bring into local option territory any quantity of liquor it would be conducive to the unlawful sale of liquor in such territory, and that the denial of such right would materially lessen the sale and promote the welfare of the citizens. We think it was not an unreasonable belief, and that the prohibition was not unwarranted, but bore a reasonable and substantial relation to the sale of liquor in local option territory, and was, therefore, a legitimate exercise of the police power.

There can be no doubt about the fact that what are known as the police powers of the state have in this day a wide scope, and there is abundant reason that they should have. In the growth and development of the country, and the intelligence of the citizen, the fact has become manifest that the people of the state are best capable of judging what is most conducive to the welfare of the public, and what is injurious to the health, morals and safety of the people. And, therefore, courts will not reverse or disturb

the judgment or act of the Legislature in such regard unless it is palpably arbitrary and unwarranted under the Constitution.

In this connection we wish to quote a passage from Mr. Justice Harlan's opinion delivered in the case of *Mugler v. Kansas*, 123 *U. S.* 623, 8 *Sup. Ct.* 273, 31 *L. Ed.* 205:

"And so, if, in the judgment of the Legislature, the manufacture of intoxicating liquors for the maker's own use, as a beverage, would *tend to cripple, if it did not defeat,* the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question. So far from such a regulation having no relation to the general end sought to be accomplished, the entire scheme of prohibition, as embodied in the Constitution and laws of Kansas, might fail, if the right of each citizen to manufacture intoxicating liquors for his own use as a beverage were recognized. Such a right does not inhere in citizenship. Nor can it be said that government interferes with or impairs any one's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks, for general or individual use, as a beverage, are, or may become, hurtful to society, and constitute, therefore, a business in which no one may lawfully engage. Those rights are best secured, in our government, by the observance, upon the part of all, of such regulations as are established by competent authority to promote the common good. No one may rightfully do that which the law-making power, upon reasonable grounds, declares to be prejudicial to the general welfare." *Crowley v. Christensen*, 137 *U. S.* 86, 11 *Sup. Ct.* 13, 34 *L. Ed.* 620.

[16] Defendant's fourth proposition is as follows:

"Whisky is a legitimate article of commerce, and in this case is interstate commerce, and as such cannot be subject to state law."

It may be conceded that the transportation or carrying of whisky sold by a citizen of the State of Pennsylvania to a citizen of the State of Delaware, from the former state to any point in the latter state, would not be subject to the Delaware statute,

except for the existence of the federal act known as the Webb-Kenyon law, no matter whether the transportation is made by common carrier or by the personal agent of the seller, and no matter where the contract is completed. The law upon this subject is very clearly expressed in 7 *Cyc.* at 416, as follows:

"A sale, the parties to which are of different states, is a transaction of interstate commerce wherever the contract of sale may be made, when the goods are to be transported from one state to another, whether the sale is made before or after shipment. Negotiations and sale in such cases through selling agents or by agents to buy is also an act of interstate commerce, as is furthermore a contract between citizens of different states to furnish goods and perform labor related thereto, or to manufacture and transport. A sale between citizens of different states is probably not a transaction of interstate commerce unless accompanied by interstate transportation of goods."

The important question, therefore, in this connection, is: Does the Webb-Kenyon law apply to the present case?

That is the subject of defendant's fifth proposition, and the last one argued, viz.:

"The federal law, known as the Webb-Kenyon act, does not rob the shipment in question of the protection of the interstate commerce law, because it was intended by the consignee to be used for a lawful purpose."

This act of Congress in terms prohibits the shipment or transportation in interstate commerce of intoxicating liquor intended *by any person interested therein, to be received, possessed sold or in any manner used* in violation of any law of the destination state.

The defendant argues that "the receipt, possession, use and sale covered by the act are all necessarily to be referred to the consignee, unless possibly in case where the consignor intends to make an illegal sale at destination; that the act does not forbid the transportation in interstate commerce of liquors intended by the person carrying them to be delivered or distributed at the termination of the interstate transportation in local option territory, where delivery and transportation are prohibited by state law; that the act does not provide that the interstate transportation

is forbidden when the liquors are intended by the person carrying them to be transported in violation of a state law which forbids transportation; that the consignee is the only person interested in the liquors who can entertain an intention to receive, possess, use or sell them contrary to the law of the destination state within the meaning of the Act of Congress, unless possibly in cases where the consignor intends to make an illegal sale at destination; that the receipt of the liquors by the defendant in Pennsylvania is not the receiving referred to in the Act of Congress, nor does the statute of this state undertake, nor could it constitutionally punish the receiving of liquors in Pennsylvania to be transported into Delaware, that the possession which the defendant had was only for the purpose of an interstate transportation; that the Webb-Kenyon law is not aimed at the receipt or possession of liquors by the person who is to transport them but only by persons interested in the liquor."

Such is the argument made in behalf of the defendant, and we think the construction sought to be placed upon the federal law by such reasoning is too narrow and is unwarranted, in view of the language of the act, and the manifest purpose which prompted its enactment.

[17] It is admitted by the case stated that the defendant who carried the liquor into local option territory in this state, was a liquor dealer, or, what amounts to the same thing, the agent of a liquor dealer. It is true that the liquor dealer's place of business was in Pennsylvania, but when he came into Delaware, in person or by his agent, for the purpose of delivering his liquor to a purchaser, he and his agent were none the less liquor dealers—engaged in the sale of liquor. It cannot be contended that the defendant was the agent of the purchaser or consignee because it is expressly admitted that he was, until the delivery of the liquor to the purchaser, the agent of the consignor—the liquor dealer.

[18] The Webb-Kenyon law prohibits the transportation in interstate commerce, from one state into another state, of intoxicating liquor which is intended by any one interested therein, to be received, possessed, sold, or in any manner used in violation of any law of the state to which it is sent.

Opinion.

The liquor dealer being interested in the liquor to the extent of its delivery, of course his agent, who was authorized to make the delivery, was interested to the same extent. Such being the case, was the liquor intended by the defendant to be received, possessed, sold, or in any manner used, in violation of the Delaware statute? It may be said here that if such intention was formed by the agent in Pennsylvania, it continued and existed in Delaware until the time of delivery. He certainly intended to carry the liquor into a part of Delaware that was local option territory. That clearly appears from the agreed statement of facts. It is not conceded by the state, and in our opinion does not appear from the case stated, that the sale of the liquor to Conaway was completed in Pennsylvania, and this is enough to distinguish this case from the Kentucky case to which we will later refer. It does appear that the order for the liquor was received and accepted in Pennsylvania, and the purchase price paid in that state, but delivery was not there made to the purchaser in person or by common carrier. From the case stated it clearly appears that after the order was accepted and the money paid there was something more to be done by the seller in respect to the liquor before the transaction of sale was complete, viz., the delivery of the liquor by the seller to the purchaser in Sussex County, Delaware, which was local option territory.

The liquor was, therefore, received by the defendant, the agent of the liquor dealer and seller, in Pennsylvania, to be carried and delivered by him into local option territory in Delaware for the purpose of completing the sale thereof to Conaway.

[19] It will not do to say that the only person interested in the liquor was the consignee, the purchaser. The liquor dealer, the seller, was interested in the liquor until it was delivered to the purchaser, otherwise he would not have incurred the expense and trouble of sending his own agent more than a hundred miles to make the delivery. Under the facts stated there can be no doubt that the loss of the liquor at any time in transit would have been the loss of the liquor dealer, and Conaway could have recovered back the purchase price which he had paid.

We assume it will not be denied that if any essential element

or part of the sale was made in local option territory in Delaware, it would constitute a violation of the law of that state which prohibits the sale of such liquor in Sussex County. And it is practically conceded by the defendant that if the liquor was received or possessed by him for the purpose or being sold in local option territory in Delaware it was within the prohibition of the Webb-Kenyon law. The following contention made by the state appears to be sustained by numerous authorities, and none to the contrary were cited by the defendant, viz.:

"Where liquor is possessed by a person outside of a prohibited district, and that person receives an order for the same, and in filling the order sends the same by his own agent or employee and not by common carrier, which agent or employee carries the liquor within the prohibited territory and there delivers the same in consummation of the sale, the sale is deemed in law to have been made in the prohibited district. The authorities hold that the place of delivery is the place of sale." 2 *Woollen & Thornton on Intox. Liquors*, 763; *Northcutt v. State*, 35 *Tex. Cr. R.* 584, 34 *S. W.* 946; *Commonwealth v. Burgett*, 136 *Mass.* 455; *Commonwealth v. Greenfield*, 121 *Mass.* 40; *Berger v. State*, 50 *Ark.* 20, 6 *S. W.* 15; *Brook v. State*, 105 *Ala.* 133, 16 *South.* 698; *Davidson v. State*, 44 *Tex. Cr. R.* 586, 73 *S. W.* 808; *Harding v. State*, 65 *Neb.* 238, 91 *N. W.* 194; *Doster v. State*, 93 *Ga.* 43, 18 *S. E.* 997.

We are of the opinion, for the reasons given, that the Webb-Kenyon law does apply to the present case, and that the defendant's act was not therefore protected by the commerce clause of the federal Constitution. He was a party interested in the liquor which he received and possessed for the purpose and with the intention of being used, carried and delivered for the purpose of being sold, in violation of the law of this state.

[20] To the objection that, assuming the liquor was sold in violation of the Delaware statute, the sale was made by the liquor dealer, Kayser, and not by the defendant, who was not the owner, we say that the defendant was nevertheless the agent of the seller, and assisted in the making of the sale. It has been decided by this court that any one who participates, or in any way assists, in the sale of intoxicating liquor in any local option territory of

the state is an accomplice within the meaning of the law, and just as guilty as if he alone had made the sale.

In discussing defendant's fifth proposition we have, so far, confined ourselves to the question whether the defendant's act in carrying the liquor, as agent of the liquor dealer, for the purpose of completing the sale by delivery in Sussex County, was within the prohibition of the Webb-Kenyon law. Being satisfied, for the reasons above given, that said act was prohibited by the Webb-Kenyon law, and was also a violation of the Hazel law, the defendant must be adjudged guilty. It is not, therefore, actually necessary that the court should express an opinion upon any other question raised by said fifth proposition. But we know that the most important and perplexing question discussed by counsel remains undecided, viz.: Whether the carrying of liquor by a liquor dealer from one state into local option territory of another state, for a purpose not in itself unlawful, is within the prohibition of the Webb-Kenyon law, when the carrying or delivery of liquor into such territory is prohibited by the laws of the destination state.

Although by no means free from difficulty, we will express an opinion upon this question, and give some reasons for our conclusion, for we realize that there is a strong and general desire among the people of the state for a determination of this question. And we further realize that such desire will not be satisfied until there is a decision by the court of last resort whose judgment will be final. Such a result cannot be obtained if the decision of this court is adverse to the state because under our Constitution the state has no right of appeal. Moreover, this case was admittedly brought to test the constitutionality of the Hazel law, as well as the applicability and constitutionality of the Webb-Kenyon law, and it is obvious, therefore, that any judgment of this court which would prevent an appeal to a higher court would defeat the main purpose of the proceeding, which is to obtain a decision of a court whose judgment will be at once authoritative and conclusive. We are convinced that a final adjudication of the questions raised in this case is desired by all the parties interested in this case as well as by the people generally. Fortunate, therefore, will it be if our conclusion upon the law shall lead to that result.

[21]  We may say that after a careful consideration of the question last above mentioned, we are of the opinion that inasmuch as the defendant was interested in the liquor, for the carrying of which he was indicted, and the same was intended by him when received to be carried from the State of Pennsylvania into local option territory in the State of Delaware, that the Webb-Kenyon law does apply, the said liquor being received, possessed or used by the defendant in violation of the law of this state. Even though the liquor was received in another state, its possession, as well as the intention with which it was originally received, continued until delivery was made in Delaware.

We are aware of the decision recently made by the Kentucky Court of Appeals in the case of *Adams Express Co., Appellant, v. Commonwealth of Kentucky, Appellee*, 157 *S. W.* 908, but not officially reported at the time of the argument of this case.  And we realize that the conclusion we have reached is in conflict with the principle of the decision given in that case.

In the Kentucky case there was an agreed statement of facts in which it was stipulated that the liquors which the express company was indicted for carrying from a point in Tennessee into local option territory in Kentucky "were intended by said consignees, respectively, for their personal use, and were so used by them, and were not intended by them to be sold contrary to law, and were not so sold by them."

In that case the sale was undoubtedly completed, and the title passed, in Tennessee.

The court said the solution of the question whether the transaction for which the express company was punished was prohibited by the Webb-Kenyon law depends "on the purpose for which the liquor was intended to be received, possessed and used. Looking to the agreed statement of facts, we find that 'said liquors were intended by said consignees, respectively, for their personal use, and were not intended by them to be sold contrary to law, and were not so sold by them."  For that reason it was held that the transaction was not prohibited by the Webb-Kenyon law, and consequently was protected by the commerce clause of the federal Constitution.

The decision of the Kentucky court was based, apparently, upon the assumption that the only persons who could be interested in the liquor, under the Webb-Kenyon law are the consignees, but we assume the decision was not intended to be broader than the facts of the case required. If that is not so, then with all due deference to that able court, we think their construction of the federal law was too narrow, and hardly consistent with the clear and admirable statement by the court of the objects sought to be accomplished by the law, which were stated in the following language:

"We may also here observe that the history of the Webb-Kenyon law, the causes that led to its enactment, and the evils it was intended to remedy, taken in connection with the carefully chosen words of the act, show that the object was to aid the states in suppressing the illegal traffic in intoxicating liquors that they had been much hindered in doing by the protection afforded violators of the law by the commerce clause of the federal Constitution."

In the Kentucky case the statute made it unlawful for a carrier to bring into or deliver in local option territory any intoxicating liquors, subject to certain exceptions; and the argument made in behalf of the commonwealth, was that "the fact that the person to whom the liquor is delivered intends to possess and use it lawfully, does not excuse the carrier from doing a thing that is forbidden by the law of the state.  *  *  *  This argument being rested," said the court, "on the proposition that, as it would be unlawful for a carrier, as an intrastate transaction, to deliver this liquor, the Webb-Kenyon law makes the delivery of it by the carrier unlawful, although it be an interstate transaction, as both interstate and intrastate shipments are now on the same footing and are to be treated precisely alike."

This is not exactly the argument made in the present case. It seems that in the Kentucky case it was not questioned by the state that the only "persons interested in the liquor" within the meaning of the Webb-Kenyon law were the consignees. Apparently the point was not made that the "carrier" was a party interested.

We think the person to whom the liquor is given for transportation and delivery is interested therein within the meaning of the federal law, and that if he intends when he receives, or has in his possession, the liquor, to carry it from a point in one state to local option territory in another state, into which the carrying is unlawful, the transaction is not protected by the commerce clause of the federal Constitution, and is prohibited by the Webb-Kenyon law—it being a violation of the law of the state into which the liquor is carried. And it may also be said that if such person carries or delivers the liquor into local option territory where such carrying or delivery is unlawful, it is used by him in violation of the law of the state within the meaning of the federal statute.

[22, 23] If this conclusion is not correct then the Webb-Kenyon law furnishes no remedy at all for the evils it was designed to cure. If, notwithstanding said law, common carriers, as well as liquor dealers by their personal representatives, can transport or carry intoxicating liquors from one state into another where such transportation and carrying is unlawful, except where it is intended by the consignee to be received or used for an unlawful purpose, then practically nothing has been accomplished by the law, because it is impossible to show such an intention except by conviction for an unlawful sale. In such case the Webb-Kenyon law is entirely immaterial. It does not matter whether the statute applies or not, because the conviction is secured without regard to the act. We appreciate the fact that the intent of an act must be gathered from its language, but nevertheless its manifest purpose, and the evils it was designed to suppress may be considered in determining its meaning and intent. There is no doubt that the purpose of the federal act was to suppress or cure certain evils resulting from interstate commerce, in states where local option or prohibition laws prevailed.

If no one is interested in an interstate shipment of liquor, within the meaning of the federal statute, except the consignee, or a consignor who ships it for the purpose of sale, then, in effect, the Webb-Kenyon act is but a re-enactment of the Wilson law passed by Congress in 1890; and nothing has been accomplished by the later act, because in order to show that it applies, in any case, it

would be necessary, as already said, to prove a sale of the liquor by the consignor or consignee upon or after delivery at destination. How, otherwise, would it be possible to establish the fact that the liquor was intended by the consignor or consignee to be received, possessed or used in violation of the state law? The mere possession is not unlawful, and if transportation is not contemplated by the Webb-Kenyon act, nothing but a sale would prove an intention to violate such law.

It may be argued that it is only necessary to prove that it was the intention of the consignor or consignee to sell the liquor, to bring the shipment within the provisions of the act; but practically, how can the purpose or intention be shown without proving the consummated act—the sale?

The Wilson law made interstate shipments of intoxicating liquor subject to state laws upon *arrival* at destination and delivery to the consignee, and thereby prevented its sale even in unbroken packages. The *sale* of such liquor in violation of the laws of the state being prevented by the Wilson act, can it be possible that the Webb-Kenyon act does nothing more? Is it not rather an indisputable fact that the later statute was enacted to supply the deficiency of the earlier one, by subjecting interstate shipments of liquor to the operation of state laws before arrival at destination, and thereby giving the state greater protection by making its laws more effective? Was not this its manifest purpose? If it was, then the reasonable construction of the act must be that the transportation of liquor is prohibited, if it is intended by the carrier to be transported in violation of the law of the destination state.

We are of the opinion that inasmuch as the Supreme Court has construed the word "arrival" in the Wilson act to mean "arrival at destination and delivery to the consignee," the Webb-Kenyon act, which was passed to supplement the Wilson act, means that an interstate shipment of liquor shall be subject to state laws upon arrival at any point within the state. Clearly that was what the law was designed to accomplish by prohibiting the transportation, and the law can be made effective only by holding that it applies to transportation agencies, as well as to

consignees and consignors who receive or ship the liquor for the purpose of sale.

To accomplish its intended purpose we give the act a broad construction, but not broader, we submit, than its terms warrant. It will be noted that Congress did not employ the word "consignee", or even "consignor and consignee", but very much broader ones, "any person interested," and it is difficult to conceive of words more comprehensive than these, or those other connecting words, "received, possessed, sold, or in any manner used."

We believe that a construction which narrows such language to consignees, not only defeats the plain object of the act, but is unwarranted in law under any rules of statutory construction. In our opinion no violence is done to the language of the act when we hold that such words are broad enough to embrace not only consignees, but also consignors, common carriers and any other transportation agencies.

[24]  In the discussion of defendant's fifth propostition we have necessarily confined ourselves to the Delaware statute known as the Hazel law, and the federal act known as the Webb-Kenyon law, because the unlawfulness of the defendant's act depends upon the violation of the one and the prohibitions of the other. But independent of either of those acts we are clearly of the opinion that the defendant was guilty, under the "local option" law of this state, of the unlawful sale of spirituous liquor in that he assisted in making or completing the sale in Sussex County.  He is not indicted, however, for a violation of that statute, neither does the agreed statement of facts bring the case within its provisions.

We are of the opinion, upon the agreed statement of facts, that under the laws of the State of Delaware and of United States of America, a crime punishable under the laws of the State of Delaware is shown to have been committed by the defendant.

After reading the foregoing opinion the court were asked by defendant's counsel to express an opinion also upon defendant's sixth proposition, so that, if the decision upon the point should

be adverse, and a writ of error is taken, the defendant's exceptions may cover every question raised in the case.

PENNEWILL, C. J., delivering the opinion of the court:

We have anticipated such request, because of an intimation given at the argument, and, in order to avoid any delay in the decision and judgment of this court, have prepared an opinion upon this very important and interesting subject, viz.: The constitutionality of the Webb-Kenyon act.

All we have said about the importance of a decision by courts of last resort upon other questions equally applies to this one, and while we feel that the question is not wholly free from doubt, nevertheless, after a somewhat careful examination of the decisions of the United States Supreme Court, we have reached the conclusion that the Webb-Kenyon act is constitutional.

Fortunately such conclusion will make it possible to take the case to the highest courts and thereby secure a final decision of this question, together with others raised in the case.

[25] By the decisions of the Supreme Court prior to the passage by Congress of the Wilson act in 1890 (*Act August* 8, 1890, *c.* 728, 26 *Stat.* 313 [*U. S. Comp. St.* 1901, *p.* 3177] ), the following principles were recognized and established, viz.: That for the purpose of protecting its people against the evils of intemperance the state has a right to prohibit the manufacture within its limits of intoxicating liquors, and also all domestic commerce in them between its own inhabitants, whether the articles are introduced from other states or from foreign countries; the state may punish those who sell intoxicating liquors in violation of its laws; it may adopt any measures tending even directly and remotely, to make the policy effective, until it passes the line of power delegated to Congress under the Constitution. But it cannot, without the *consent of Congress, expressed or implied*, regulate commerce between its people and those of the other states of the Union in order to effect its end, however desirable such a regulation might be, because the right of transportation from one state to another includes, by necessary implication, the right of the importer to sell in unbroken packages at the place where the transit terminates;

the very purpose and motive of that branch of commerce which consists in transportation is that other and consequent act of commerce which consists in the sale and exchange of the commodities transported. *Brown v. Maryland*, 25 *U. S.* (12 *Wheat.*) 419, 6 *L. Ed.* 678; *Bowman v. Chicago & Northwestern R. R. Co.*, 125 *U. S.* 465, 8 *Sup. Ct.* 689, 1062, 31 *L. Ed.* 700 (1888); *Leisy v. Hardin*, 135 *U. S.* 100, 10 *Sup. Ct.* 681, 34 *L. Ed.* 128 (1890).

The last mentioned case expressly established the principle that the right to import gives the right to sell in the original package, the court declaring that "the power vested in Congress to regulate commerce between the states cannot be stopped at the state line, but is capable of authorizing the disposition within the state of the thing imported as long as it remains in the original package," thereby overruling, to that extent, the decision previously given in the *License cases*, 5 *How.* 505, 18 *L. Ed.* 497 (1847), that after liquor passes the borders of a state it becomes amenable to state laws.

It is not contended, neither do we believe, that an interstate shipment of liquor would be subject to the laws of the destination state from the time it passes its borders, in the absence of an act of Congress limiting the effect of the regulation between the states. There was no such act in existence at the time the above mentioned cases were decided.

[26]   The first act of the kind was the Wilson act, approved August 8, 1890, entitled "An act to limit the effect of the regulations of commerce between the several states and with foreign countries in certain cases," which provides as follows: "That all fermented, distilled or other intoxicating liquors or liquids transported into any state or territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such state or territory be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such state or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

This act was held in *In re Rahrer*, 140 *U. S.* 545, 11 *Sup. Ct.*

865, 35 *L. Ed.* 572 (1891), to be constitutional, the court deciding that Congress had the right to divest an article of commerce of its interstate attributes at an earlier time than would otherwise be the case, and that the act was not a delegation of the powers of the United States to a state. More particular reference will be made to this case later in the opinion.

The Wilson act was again before the Supreme Court in *Rhodes v. State of Iowa*, 170 *U. S.* 412, 18 *Sup. Ct.* 664, 42 *L. Ed.* 1088 (1898).

This was a common carrier case, in which a shipment of liquor was made from Illinois into Iowa contrary to a statute of the latter state which prohibited a common carrier from transporting intoxicating liquors between points within the state. The agent of the carrier, who took the package from the car to the warehouse, preparatory to delivery to the consignee, was arrested for violating the statute. The question before the court was whether the law of Iowa could be made to apply to a shipment of liquor by an interstate carrier before it had reached its destination; that is, before delivery to the consignee.

The decision of the court turned upon the meaning and proper construction of the word "arrival", as used in the statute, and in no sense did it hold, or pretend to hold, that the right to make interstate commerce shipments of intoxicating liquor might not be submitted to state control, when the transportation was prohibited by an act of Congress.

The court said: "We think that, interpreting the statute by the light of its provisions, it was not intended to and did not cause the power of the state to attach to an interstate commerce shipment, whilst the merchandise was in transit under such shipment, and until its arrival at the point of destination and delivery there to the consignee, and of course this conclusion renders it entirely unnecessary to consider whether if the act of Congress had submitted the right to make interstate commerce shipments to state control it would be repugnant to the Constitution."

The court also said: "If it had been the intention of the act of Congress to provide for the stoppage at the state line of every interstate commerce contract relating to the merchandise named

in the act, such purpose would have been easy of expression."
The reasonable inference from such language would seem to be
that the court inclined to the opinion that Congress had the power
to so provide.

And the court further said: "The purpose of Congress to sub-
mit the incidental power to sell to the dominion of state authority
should not without the clearest implication be held to imply the
purpose of subjecting to state laws a contract which in its very
object and nature was not susceptible of such regulation even if the
constitutional right to do so existed, as to which no opinion is
expressed."

While the court said that the words of the statute, "shall
upon arrival," in one sense might be held to mean arrival at the
state line, they were construed to mean "arrival at the point of
destination and delivery there to the consignee."

The defendant in that case was arrested, as we have said,
for an act which occurred before the merchandise arrived at such
point, when it was not yet affected by the federal statute, and
had not, therefore, lost the character and effect of interstate
commerce merchandise.

The effect of the decision in the case of *Rhodes v. Iowa*, was
the further recognition of the right of the state, by and with the
consent of Congress, to prohibit or restrict within its territory the
*sale of liquor which was brought there as an interstate shipment*, and
the decision, to that extent, overruled the earlier case of *Leisy v.
Hardin*, to which we have above referred, which decided that the
right to import gives the right to sell in the original package. This
clearly appears from the following language of the court:

"The *Bowman case* was decided in 1888; the opinion in *Leisy
v. Hardin* was announced in April 1890; the act under considera-
tion was approved August 8, 1890. Considering these dates it is
reasonable to infer that the provisions of the act were intended
by Congress to cause the legislative authority of the respective
states to attach to intoxicating liquors coming into the states by
an interstate shipment only after the consummation of the ship-
ment, but before the sale of the merchandise; that is, that the
one receiving merchandise of the character named, whilst retain-

Opinion.

ing the full right to use the same, should no longer enjoy the right to sell free from the restrictions as to sale created by state legislation, a right which the decision in *Leisy v. Hardin* had just previously declared to exist."

The court were construing the Wilson act, interpreting its meaning and effect, and under the construction which was placed on the word "arrival", they were not called upon to decide whether a state could prohibit an interstate commerce shipment or transportation of liquor into its territory in violation of the law of the state, when such transportation is expressly prohibited by the federal law.

Such question was not before the court, or in any manner passed upon, in the *Rhodes case*, in the later case of *Adams Express Co. v. Iowa*, 196 *U. S.* 147, 25 *Sup. Ct.* 185, 49 *L. Ed.* 424 (1905), or in any other case, so far as we have been able to find, except in the case of *In re Rahrer*.

In all of the other cases it was held that the interstate shipment was not affected by the state law while in transit, because the Wilson act did not touch it until arrival at destination. The reasoning in all was the same, and the principles established or recognized in the *Brown* and *Bowman cases* were generally reaffirmed, viz., that a state, unaided by an act of Congress, could not defeat or interfere with an interstate commerce shipment of merchandise. Of course, the state has not such power if its law is not supplemented or reinforced by an act of Congress as broad as its own. The Wilson act was not such a statute, but the Webb-Kenyon law is. The Supreme Court has not yet declared, except in *In re Rahrer*, what its decision would be if the Wilson act had made interstate shipments of liquor subject to state laws from the time they reach the borders of the state. On the contrary the court has so far refrained from expressing an opinion upon the question except in the one case.

The Supreme Court has expressly declared that under its power to regulate commerce between the states Congress may provide that "intoxicating liquor when transported from one state to another shall lose its character as interstate commerce upon completion of delivery under the contract of interstate shipment, and before sale in the original package." *American Express Co. v. Iowa*, and other cases above mentioned.

In the *Express Company case* the court, in speaking of the decision in the *Rhodes case*, said: "The general doctrine respecting interstate shipments was qualified to the extent called for by the provisions of the Wilson act." But the court declined to express an opinion as to the authority of Congress, under the power to regulate commerce, to delegate to the states the right to forbid the *transportation* of merchandise from one state to another.

In the case of *Louisville & Nashville R. R. Co. v. Cook Brewing Co.*, 223 *U. S.* 70, 32 *Sup. Ct.* 189, 56 *L. Ed.* 355, which is the latest decision of the Supreme Court upon the subject, the question before the court was the same, viz., the application of the Wilson act to interstate shipments of liquor, and the only point raised and adjudicated was that said act did not apply to such shipments until delivery to the consignee.

The court did hold that the Kentucky statute, prohibiting common carriers from transporting intoxicating liquors to dry points in Kentucky, while a valid enactment as to intrastate shipments, was not effective as to interstate shipments, and in that respect was an unconstitutional interference with interstate commerce. Because of such language the case has been considered as a strong and binding authority against the validity of the Webb-Kenyon law. But we believe that because the Wilson act, on account of its peculiar language, did not apply, the court could do nothing other than hold the state law, in itself, to be an unconstitutional interference with interstate commerce. It is not contended for a moment that a state law unaided by an act of Congress could be anything else. But we are convinced that, if the Wilson act had been as broad and clear as the Webb-Kenyon law, the language of the court would not have been the same, and the decision would have been different.

Mr. Justice Lurton in delivering the opinion of the court said:

"The defense is based solely upon the terms of the Kentucky act." The court declared that,—

"By a long line of decisions, beginning even prior to *Leisy v. Hardin*, it has been indisputably determined:

"(a) That beer and other intoxicating liquors are a recognized and legitimate subject of interstate commerce:

"(b) That it is not competent for any state to forbid any common carrier to transport such articles from a consignor in one state to a consignee in another;

"(c) That until such transportation is concluded by delivery to the consignee, such commodities do not become subject to state regulation, restraining their sale or disposition.

"The Wilson act, which subjects such liquors to state regulation, although still in the original packages, does not apply before actual delivery to such consignee where the shipment is interstate."

The natural and necessary inference from such language would seem to be that it would be competent to forbid any common carrier to transport intoxicating liquor from a consignor in one state to a consignee in another if the Wilson act did apply, and also that it would or might apply if its language warranted the application, as the Webb-Kenyon act unmistakably does.

There can be no doubt that by the Wilson act Congress gave the states partial protection in permitting them to prohibit *the sale* of interstate shipments of intoxicating liquor even in original packages, after delivery to consignee, and that the Supreme Court has upheld and sustained such power.

There is a more recent license case which practically reaffirms the doctrine of the "License Cases", and should have some bearing upon the subject under consideration. We refer to the case of *Phillips v. Nobile*, 208 *U. S.* 472, 28 *Sup. Ct.* 370, 52 *L. Ed.* 578, in which the court said:

"The sale of liquors is confessedly a subject of police regulation. Such sale may be absolutely prohibited, or the business may be controlled and regulated by the imposition of license taxes, by which those only who obtain licenses are permitted to engage in it. * * * Even where the subject of transportation is not intoxicating liquor, the court has held that goods brought in the original packages from another state, having arrived at their destination and being at rest there, may be taxed, without discrimination, like other property within the state, even while in the original packages in which they were brought from another state."

In *Vance v. W. A. Vandercook Co.*, 170 *U. S.* 438, 18 *Sup. Ct.* 674, 42 *L. Ed.* 1100, which followed the decision previously given in *Scott v. Donald*, 165 *U. S.* 58, 17 *Sup. Ct.* 265, 41 *L. Ed.* 632, the court seemed to concede that it is not within the power of the state, even when reinforced by the act of Congress (Wilson act), to deprive a resident of one state of the right to ship liquor into another state to a resident for his own use, "because such right is derived from the Constitution of the United States"; yet it held that an act of the state can validly declare that all liquors imported from other states, for the purpose of sale in original packages, can be seized and confiscated. Manifestly such state legislation was upheld because of the provisions of the Wilson act. The language used by the court was as follows:

"The claim that the state statute is unconstitutional because it deprives of the right to sell imported liquor in the original packages, rests therefore, on the assumption that the state law is a regulation of interstate commerce, because it forbids the doing of an act which in consequence of the permissive grant resulting from the act of Congress, the state had undoubtedly the lawful power to do. Indeed, the entire argument by which it is endeavored to maintain the contention arises from excluding from view the change as to the sale of intoxicating liquor arising from the act of Congress."

Our thought, that if the sale of an interstate shipment of liquor can be legally prohibited in the original package, logically and necessarily its shipment may be also forbidden, is very clearly expressed in the dissenting opinion delivered in the *Vance case*, when discussing a point not essential to the decision of the case, as follows:

"But if the act of Congress can validly operate to authorize the state to forbid the sale in original packages of imported articles of the same kind with those whose manufacture and sale within the state are permitted and regulated, I am unable to see why it cannot also operate to authorize the state to forbid the importation for use. Once concede that it is competent for Congress to abdicate its control over interstate commerce in articles whose manufacture, sale and use are lawful within the state, and

to confer upon the state the power to forbid importation of such articles for *sale*, it must follow that it would equally be competent for Congress to authorize the state to forbid the importation of such articles for use. And, conversely, if it be not competent for Congress to authorize a state to forbid the importation for use of articles whose use in domestic commerce is lawful, so it would not be competent for Congress to authorize a state to forbid the importation for sale of articles whose sale in domestic commerce is lawful."

The dissenting Chief Justice and Justices did not believe that Congress intended any such act of abdication by the Wilson act, and held its plain meaning to be, "That if, in the *bona fide* exercise of its police power, the state finds it necessary to declare that all fermented, distilled or other intoxicating liquor is of a detrimental character, and that its use and consumption are against the morals, good health and safety of its inhabitants, it may legislate, on that assumption, with equal effect as to such liquor whether imported or of domestic manufacture. Such legislation may take the form of total prohibition, and be valid, as we held in *In re Rahrer*, under a statute of the State of Kansas. The articles prohibited were thus taken out of the sphere of commerce, whether interstate or domestic, and no discriminations were thereby made or attempted adversely to the persons or property of other states. Or, the legislation may seek to regulate the sale of intoxicating liquors, and if the regulations are reasonable, in the fair exercise of the police power, applicable alike to articles imported and to those made in the state, their validity may well be sustained, without infringing upon the federal control of interstate commerce."

The dissenting opinion agreed with the opinion of the majority except that part of the majority opinion which held that intoxicating liquors could not be shipped into the state to agents for the purpose of being stored and sold therein in original packages. The minority held that such sale was as necessary a part of interstate commerce as the transportation.

The decision of the court in this case, as in other cases to which we have referred, was based upon the language and effect of

the Wilson act, and it does not appear what would have been the reasoning and conclusion if an act similar to the Webb-Kenyon law had been under consideration.

As a result of our examination of the Supreme Court cases we are of the opinion that Congress was justified in believing it had the constitutional right to pass the Webb-Kenyon act. When the Supreme Court, in the cases to which we have referred, held that the state, under the authority of the Wilson act, had the right to prohibit the *sale* of intoxicating liquors imported from another state, even in the original packages, the principle contended for by the state, and clearly expressed in the Webb-Kenyon law was recognized and conceded, because in the earlier cases, as we have seen, it was distinctly held that the right to sell such merchandise was a necessary part or incident of interstate commerce.

The point we wish to emphasize is, that Congress, by the Wilson act, did not subject, or mean to subject an interstate shipment of intoxicating liquor to the control of state laws before its arrival at destination and delivery to consignee.

If Congress has the power to divest an article of commerce of its interstate attributes at an earlier time than would otherwise be the case, and such an act would not be a delegation of the powers of the United States to a state, then it would seem reasonable to believe that it had the power to subject interstate shipments, from the time they entered the state, to the operation of state laws *bona fide* enacted under its police powers to promote the health and welfare of its citizens, because the rights and protection afforded by the commerce clause of the Constitution are not, logically and in principle, susceptible of division. If an article of commerce can be divested of its interstate attributes, and shorn of its protection, in part, by an act of Congress, it is difficult to see why it cannot be wholly divested of such attributes in a state whose laws seek to control it for the good of its citizens. If it is possible, under a federal act, to legally prevent its sale in the original package at the point of destination why cannot its transportation within the state to such point be equally prevented?

It is insisted that state interference with the shipment, notwithstanding the Webb-Kenyon law, would affect the constitutional right of a citizen of one state to contract for the delivery of merchandise into another state. Would not the prohibition of the sale of such merchandise in the original package, under the Wilson act, equally affect such right of contract? In either case the right of contract would be affected only indirectly, and in respect to an article the traffic in which the state had forbidden in the exercise of its police powers. When we consider that Congress has the constitutional right to "regulate commerce" between the states and that the state has the right to absolutely prohibit, intrastate, the transportation and sale of any article which it deems injurious to the public safety, and may impose license taxes to the extent of practically prohibiting the importation of such an article into the state, it seems to us that the right to contract for on interstate shipment is as seriously affected thereby as would be the case if interstate transportation was expressly prohibited.

[27] The contention that "the inevitable consequence of allowing a state law to forbid interstate shipments of merchandise would be to destroy the right to contract beyond the limits of the state for such shipment" is based largely on the reasoning in the *Bowman case* from which the quotation is taken. But that decision was made upon a law of Iowa without regard to any federal statute. It was before the passage of the Wilson act. Both the transportation and sale were held by the Supreme Court, in the earlier cases, to be covered and protected by the commerce clause of the Constitution, and surely the denial of either would materially affect, if not indirectly prevent, the making of contracts for interstate shipments. If the sale of intoxicating liquor is a subject of police regulation why is not its transportation equally so, in view of the legislative belief that the transportation is so closely related to the sale that the sale cannot be prevented unless the transportation is prohibited. There can be no doubt that intrastate transportation can be prohibited by law if the Legislature is justified in believing it is substantially connected with the sale. Why then should not the same principle apply to interstate transportation when prohibited by the federal law, it being conceded that the *sale* of such shipments may be prohibited?

[28] It has also been strongly urged that an act of Congress which prohibited the shipment of intoxcating liquor from one state to another would be a delegation of the powers of the United States to a state and therefore unconstitutional. But it does not seem to us that such an objection can be successfully made to the Webb-Kenyon law. It is an exercise, and not a delegation, of power. It expressly prohibits the transportation of intoxicating liquor that is intended to be used in violation of the law of the state. Under its power "to regulate commerce" between the states, is it not reasonable to believe that Congress may make such a prohibition?

But the Supreme Court, in the case of *In re Rahrer*, decided that the Wilson act, as construed by the court, was not a delegation of the federal power to a state.

And, in the dissenting opinion to which we have referred, in speaking on this particular point, as to which there was apparently no division in the court, the following language was used:

"The act in question [Wilson act] may well be regarded as a legislative attempt to define the boundaries between federal and state powers in respect to interstate commerce in intoxicating liquors; and this court, in the cases of *In re Rahrer* and of *Scott v. Donald*, and in the recent case of *Rhodes v. Iowa*, has so treated it. But it cannot, as I think, be either interpreted or sustained as an effort to transfer the regulative control in matters of interstate commerce from the nation to the states."

It will be remembered that the dissenting judges held that Congress had as much right to prohibit the transportation as the sale, and, therefore, their reasoning, as to the delegation of power, would apply as well to the Webb-Kenyon law as to the Wilson act.

The statute now before the court is the Webb-Kenyon law, and the question is, can Congress constitutionally divest intoxicating liquors of their interstate character or attributes, when shipped into the state to be used in violation of a statute of the state that was passed in the *bona fide* and reasonable exercise of its police power to promote the public welfare? We believe it can, and are, therefore, of the opinion that the Webb-Kenyon act is

constitutional and valid. And we also believe that there is no decision of the Supreme Court which holds that Congress has not such power.

The Supreme Court has, in more than one case, expressly declined to express an opinion on the question. It seems to us that the holding of such an act to be constitutional would be the natural, logical and inevitable development of legislative and judicial action upon a subject of great interest and importance to state and citizen. The history of legislation, as well as of decisional law, upon the subject, is interesting. The "License Cases" held that the sale of interstate intoxicating liquor might be prohibited by the state even in the absence of a federal law. Subsequently the Supreme Court decided that the state could not prevent such sale in original packages. Later the Wilson act was passed, and the court held it to be constitutional, and that it gave the state the right to prohibit the sale of an interstate shipment of intoxicating liquor, even in the original package, after arrival at destination.

That was the purpose and extent of the Wilson act, as interpreted by the Supreme Court. The Webb-Kenyon act was passed to supply the deficiency in the Wilson law, and make the transportation, as well as the sale, of interstate intoxicating liquors subject to state law. Such a law was necessary to give the state the right to prevent a traffic in an article which the Legislature believed to be detrimental to the health and welfare of its citizens. We think the federal statute should be broadly and reasonably construed, so as to protect the state in the exercise of such right, and we further think that such a construction would not be in conflict with the principle of any decision heretofore made by the Supreme Court, under the commerce clause of the Constitution of the United States. Indeed, we are satisfied that such a construction would be in harmony with the principle and reasoning of all the decisions of said court upon the subject since the passage of the Wilson act.

There can be no doubt that under the decisions of the Supreme Court, the following principles may be regarded as fully established:

[29] 1. That the police power is inherent in the state, and

is given a scope and exercise within the state commensurate with what the Legislature reasonably believes to be necessary for the protection and preservation of the health, morals and welfare of its citizens.

[30]   2. That the manufacture and sale of intoxicating liquor is a subject of police regulation by the state.

[31]   3. That the state may, in the *bona fide* exercise of its police power, make unlawful the manufacture, sale and transportation of intoxicating liquor, as injurious to the health and safety of its inhabitants, and that by an act of Congress such liquor can be divested of its interstate commerce character sooner than would otherwise be the case.

Therefore we think it logically and necessarily follows that Congress has the power to prohibit the shipment of intoxicating liquor into a state having such law, and by such prohibition the article is taken out of the sphere of legitimate interstate commerce within the state.

In other words, Congress may, under its power to regulate commerce between the states, supplement, and in effect ratify, the prohibitory laws of the state, by extending the prohibition to interstate shipments.

In the *Lottery case*, reported in 188 *U. S.* 358, 360, 361, 23 *Sup. Ct.* 321, 329 (47 *L. Ed.* 492), it was held that the carriage of lottery tickets from one state into another, by independent carriers, is interstate commerce, and may be prohibited by an act of Congress; and in the course of its opinion the court said: "So that we have in the *Rahrer case* a recognition of the principle that the power of Congress to regulate interstate commerce may sometimes be exerted with the effect of excluding particular articles from such commerce." To the same effect is *Pabst Brewing Co. v. Crenshaw*, 198 *U. S.* 24, 40, 25 *Sup. Ct.* 552, 49 *L. Ed.* 925, in which the court agreed with the reasoning in the *Rahrer case*.

In *Foppiano v. Speed*, 199 *U. S.* 517, 26 *Sup. Ct.* 138, 50 *L. Ed.* 288, the validity of a state license for sales of intoxicating liquors on ferryboats running from one state to another was sustained.

The case of *Plumley v. Massachusetts*, 155 *U. S.* 474, 15 *Sup.*

*Ct.* 161, 39 *L. Ed.* 223, sustained the prohibition of the sale of oleomargarine not colored yellow, although it was imported. In that case the court said: "The judiciary of the United States should not strike down a legislative enactment of a state, especially if it has direct connection with the social order, the health, and the morals of its people, unless such legislation plainly and palpably violates some right granted or secured by the national Constitution," etc.

The prohibition of the transportation of intoxicating liquor is considered, when supplemented and reinforced by an act of Congress, as taking from intoxicating liquors their character of interstate commerce, and placing them in the same category as lottery tickets, oleomargarine and deleterious drugs, the interstate transportation of which may unquestionably be prohibited.

[32] We are fully convinced that when a state seeks by positive law, enacted in the fair and reasonable exercise of the police power, to prohibit the manufacture and sale of intoxicating liquors within its limits, and in order to make such law more effective seeks to regulate the transportation of such liquors by prohibiting the bringing or carrying of the same into its local option territory by common carriers and liquor dealers, such transportation being substantially connected with the forbidden sale, and also prohibited by an act of Congress, the state legislation should and can be sustained under both state and federal Constitutions. In view of the wide latitude accorded to the states in the exercise of the police power, we cannot see how such protection can be denied when the state law is supplemented and reinforced by an act of Congress which was clearly designed to give such protection. And, moreover, it is difficult to see why the conclusion we have reached is not fully sustained by the reasoning of the court in *In re Rahrer* to which we have already referred, and which is not in conflict with any other Supreme Court case. We regard that authority as more in point than any other because it comes nearer to a determination of the crucial question involved in the present case.

The opinion was delivered by Mr. Fuller, then Chief Justice, the question before the court was the constitutionality and

effect of the Wilson act, and we quote from the decision the following language, as being directly in point, viz.:

"The laws of Iowa under consideration in *Bowman v. Railway Co.*, 125 *U. S.* 465 [8 *Sup. Ct.* 689, 1062, 31 *L. Ed.* 700], and *Leisy v. Hardin*, 135 *U. S.* 100 [10 *Sup. Ct.* 681, 34 *L. Ed.* 128], were enacted in the exercise of the police power of the state, and not at all as regulations of commerce with foreign nations and among the states, but as they inhibited the receipt of an imported commodity, or its disposition before it had ceased to become an article of trade between one state and another, or another country and this, they amounted in effect to a regulation of such commerce. Hence it was held that, inasmuch as interstate commerce, consisting in the transportation, purchase, sale and exchange of commodities, is national in its character and must be governed by a uniform system, so long as Congress did not pass any law to regulate it specifically, or in such way as to allow the laws of the state to operate upon it, Congress thereby indicated its will that such commerce should be free and untrammeled, and therefore that the laws of Iowa, referred to, were inoperative, in so far as they amounted to regulations of foreign or interstate commerce, in inhibiting the reception of such articles within the state, or their sale upon arrival, in the form in which they were imported there from a foreign country or another state. It followed as a corollary that, when Congress acted at all, the result of its action must be to operate as a restraint upon that perfect freedom which its silence insured.

"Congress has now spoken, and declared that imported liquors or liquids shall, upon arrival in a state, fall within the category of domestic articles of a similar nature. Is the law open to constitutional objection? * * *

"It does not admit of argument that Congress can neither delegate its own powers nor enlarge those of a state. This being so, it is urged that the act of Congress cannot be sustained as a regulation of commerce, because the Constitution, in the matter of interstate commerce, operates *ex proprio vigore* as a restraint upon the power of Congress to so regulate it as to bring any of its subjects within the grasp of the police power of the state. In

other words, it is earnestly contended that the Constitution guarantees freedom of commerce among the states in all things, and that not only may intoxicating liquors be imported from one state into another, without being subject to regulation under the laws of the latter, but that Congress is powerless to obviate that result.

"Thus the grant to the general government of a power designed to prevent embarrassing restrictions upon interstate commerce by any state would be made to forbid any restraint whatever. We do not concur in this view. In surrendering their own power over external commerce the states did not secure absolute freedom in such commerce, but only the protection from encroachment afforded by confiding its regulation exclusively to Congress.

"By the adoption of the Constitution the ability of the several states to act upon the matter solely in accordance with their own will was extinguished, and the legislative will of the general government substituted. No affirmative guaranty was thereby given to any state of the right to demand as between it and the others what it could not have obtained before; while the object was undoubtedly sought to be attained of preventing commercial regulations partial in their character or contrary to the common interests. And the magnificent growth and prosperity of the country attest the success which has attended the accomplishment of that object. But this furnishes no support to the position that Congress could not, in the exercise of the discretion reposed in it, concluding that the common interests did not require entire freedom in the traffic in ardent spirits, enact the law in question. In so doing Congress has not attempted to delegate the power to regulate commerce, or to exercise any power reserved to the states, or to grant a power not possessed by the states, or to adopt state laws. It has taken its own course and made its own regulation, applying to these subjects of interstate commerce one common rule, whose uniformity is not affected by variations in state laws in dealing with such property.

"The principle upon which local option laws, so called, have been sustained is that, while the Legislature cannot delegate its

power to make a law, it can make a law which leaves it to municipalities or the people to determine some fact or state of things, upon which the action of the law may depend; but we do not rest the validity of the act of Congress on this analogy. The power over interstate commerce is too vital to the integrity of the nation to be qualified by any refinement of reasoning. The power to regulate is solely in the general government, and it is an essential part of that regulation to prescribe the regular means for accomplishing the introduction and incorporation of articles into and with the mass of property in the country or state. 12 *Wheat.* 448, 6 *L. Ed.* 678.

"No reason is perceived why, if Congress chooses to provide that certain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at an earlier period of time than would otherwise be the case, it is not within its competency to do so.

"The differences of opinion which have existed in this tribunal in many leading cases upon this subject, have arisen, not from a denial of the power of Congress, when exercised, but upon the question whether the inaction of Congress was in itself equivalent to the affirmative interposition of a bar to the operation of an undisputed power possessed by the states.

"We recall no decision giving color to the idea that when Congress acted its action would be less potent than when it kept silent.

"The framers of the Constitution never intended that the legislative power of the nation should find itself incapable of disposing of a subject-matter specifically committed to its charge. The manner of that disposition brought into determination upon this record involves no ground for adjudging the act of Congress inoperative and void. * * *

"In the case at bar, petitioner was arrested by the state authorities for selling imported liquor on the ninth of August, 1890, contrary to the laws of the state. The act of Congress had gone into effect on the eighth of August, 1890, providing that imported liquors should be subject to the operation and effect of the state laws to the same extent and in the same manner as though the liquors had been produced in the state; and the law of Kansas

Opinion.

forbade the sale. Petitioner was thereby prevented from claiming the right to proceed in defiance of the law of the state, upon the implication arising from the want of action on the part of Congress up to that time. The laws of the state had been passed in the exercise of its police powers, and applied to the sale of all intoxicating liquors whether imported or not, there being no exception as to those imported, and no inference arising, in view of the provisions of the state Constitution and the terms of the law (within whose mischief all intoxicating liquors came), that the state did not intend imported liquors to be included. We do not mean that the intention is to be imputed of violating any constitutional rule, but that the state law should not be regarded as less comprehensive than its language is, upon the ground that action under it might in particular instances be adjudged invalid from an external cause.

"Congress did not use terms of permission to the state to act, but simply removed an impediment to the enforcement of the state laws in respect to imported packages in their original condition, created by the absence of a specific utterance on its part. It imparted no power to the state not then possessed, but allowed imported property to fall at once upon arrival within the local jurisdiction.

"It appears from the agreed statement of facts that this liquor arrived in Kansas prior to the passage of the act of Congress, but no question is presented here as to the right of the importer in reference to the withdrawal of the property from the state, nor can we perceive that the congressional enactment is given a retrospective operation by holding it applicable to a transaction of sale occurring after it took effect. This is not the case of a law enacted in the unauthorized exercise of a power exclusively confided to Congress, but of a law which it was competent for the state to pass, but which could not operate upon articles occupying a certain situation until the passage of the act of Congress. That act in terms removed the obstacle, and we perceive no adequate ground for adjudging that a re-enactment of the state law was required before it could have the effect upon imported which it had always had upon domestic property.

"Jurisdiction attached, not in virtue of the law of Congress,

but because the effect of the latter was to place the property where jurisdiction could attach."

We think the reasoning of the court in that case is applicable to the present case, and clearly establishes the constitutionality of the Webb-Kenyon act.

We realize that a distinction may be attempted to be made between the Wilson act and the Webb-Kenyon act in respect to the delegation of power to the states to regulate commerce.

The earlier act was held not to be a delegation of such power, because Congress thereby took "its own course and made its own regulation, applying to these subjects of interstate commerce one common rule, whose uniformity is not affected by variations in state laws in dealing with such property." *In re Rahrer* (near end of the opinion).

It may be insisted that the later act establishes a rule respecting subjects of interstate commerce which would not be uniform, but affected by variations in state laws.

But in principle would there be any difference in the application of the two acts to subjects of interstate commerce, so far as the delegation of the federal power is concerned?

Under the Wilson act interstate shipments are made subject to state laws upon arrival at destination. True, the rule thus established is common and uniform, but whether the shipment may be sold in the original package after delivery to the consignee, depends upon whether the law of the state prohibits the sale.

The Webb-Kenyon law prohibits the transportation, interstate, of intoxicating liquor in violation of the law of the state to which it is sent. The rule here established is also common and uniform in the sense that it applies to all shipments of liquor from any one state to another in violation of the laws of the destination state. Of course, whether or not the transportation is prohibited would depend upon the laws of the state to which it is transported. But the material and important point is, that under both the Wilson act and the Webb-Kenyon act, the validity of a shipment of intoxicating liquor from one state to another depends upon laws of the destination state. Under the former act the shipment is made subject to state laws at a certain stage in transit.

In some states it might be sold, in others its sale would be prohibited. In some it would practically be deprived of the protection afforded by the commerce clause of the federal Constitution, and in others it would not be. It would depend absolutely upon the law of the state.

Under the latter act the legality of the transportation of intoxicating liquor from one state to another is made to depend upon the laws of the state to which it is sent. Between some states it would be legal, between others it would be illegal. So, we are unable to see, except by very technical and refined reasoning, that there is any real and practical difference between the two rules respecting the delegation of federal power to the states. In principle they are the same, because the validity of the shipment is made to depend upon the laws of the state in force at the time. Those laws may be different in different states, and may vary from time to time in the same state, but under either the Wilson or Webb-Kenyon act the interstate shipment of liquor is made subject to or dependent upon the laws of the destination state existing at the time of the shipment. Under the one an interstate shipment is made subject to state law upon arrival in the state, and under the other the shipment is prohibited if made in violation of the law of the state. That is to say: Under the Wilson act the shipment would lose the character and protection of interstate commerce if the state law prohibited its transportation or sale, and under the Webb-Kenyon act the shipment would lose the character and protection of interstate commerce if it was made in violation of the law of the state. In either case the character of the shipment would depend upon state laws. And that fact was held in the *Rahrer case* not to invalidate the federal act.

The court being of the opinion upon the law, and the facts admitted in the case stated, that under the laws of the State of Delaware, and of the United States of America, a crime punishable under the laws of the State of Delaware is stated or shown to have been committed by the defendant, the jury is charged and directed to return a verdict of guilty against the defendant; and it is ordered that judgment be entered against the defendant upon such verdict, in conformity with the terms and stipulations of the case stated.                                          Verdict, guilty.